John **RUST**, Otha Hart, Jerry Bussard, James Wichman, Leslie Bussard, William Durand, Robert Sams, Colin Allen, James Harlow, Terrance Yager, Robert Costello, and Roy Lyman, Plaintiffs,

v.

Harold W. **CLARKE**, Individually, and as Director of Nebraska Department of Correctional Services; Gary Grammer, Individually, and as Assistant Director of Adult Institutions for the Nebraska Department of Correctional Services; Frank X. Hopkins, Individually, and as Warden of the Nebraska State Penitentiary; Robert Houston, Individually, and as Deputy Warden of the Nebraska State Penitentiary; Mark Rosenau, Individu-

ally, and as the Protestant Chaplain and the Head of the Religion Department for the Nebraska State Penitentiary; Dean Naylor, Individually, and as the Major for the Custody Force for the Nebraska State Penitentiary; Mario Peart, Individually, and as Associate Warden/External Operations for the Nebraska State Penitentiary; Kathleen Taylor, Individually, and as Food Service Director for the Nebraska State Penitentiary; and Mike Kenney, Individually, and as Deputy Warden of the Nebraska State Penitentiary, Defendants.

No. 4:CV92–3107.

United States District Court, D. Nebraska.

April 26, 1995.

David L. Buelt & Daniel L. Rock, Ellick, Jones, Buelt, Blazek and Longo, Omaha, NE, for plaintiffs.

Don Stenberg, Atty. Gen., Terri M. Weeks, Asst. Atty. Gen., Lincoln, NE, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

KOPF, District Judge.

The bench trial of this matter having been concluded, I now issue my findings of fact

and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a). In this action brought under 42 U.S.C. § 1983, Plaintiffs allege that Defendants denied them their right to freely exercise their religion in violation of the First Amendment and the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. §§ 2000bb to 2000bb–4. I find and conclude that judgment should be entered for Defendants.

## I. PROCEDURAL HISTORY

In this § 1983 action, Plaintiffs, who are inmates at the Nebraska State Penitentiary, have alleged that Defendants, who are employees of the Nebraska Department of Correctional Services, violated their right to freely exercise their religious beliefs in several ways. (Filing 46, Second Am.Compl. at 2–8.) Plaintiffs allege that their religious preference is Asatru, which is an Icelandic term for the ancient religion of the Teutonic people of Northern Europe. (*Id.* ¶ 17.) Asatru is also known as "Odinism" or "Troth." (*Id.*)

Although Plaintiffs' second amended complaint alleged that Defendants' actions violated Plaintiffs' rights under the Free Exercise and Freedom of Speech Clauses of the First Amendment and the Equal Protection and Due Process Clauses of the Fourteenth Amendment, the parties in this case have since agreed that this lawsuit shall be decided on the standards set out in RFRA, which are described in section III of this memorandum. (Order on Final Pretrial Conference, Filing 95 at 22.) Fed.R.Civ.P. 16(e) (final pretrial conference order controls subse-

quent course of the action unless modified by subsequent order).

Plaintiffs have requested declaratory and injunctive relief, as well as compensatory damages. (Filing 46, Second Am.Compl. at 9.) This court granted Defendants' motion for summary judgment (filing 65) as to money damages, finding that Defendants have immunity from damages under the Eleventh Amendment and the doctrine of qualified immunity, and that the suit should proceed upon Plaintiffs' requests for declaratory and injunctive relief only. *Rust v. Clarke*, 851 F.Supp. 377, 381 (D.Neb.1994).

The parties later filed cross-motions for summary judgment with supporting evidence (filings 86–90) which were denied at the beginning of the bench trial in this matter. (Tr. 4:4–6.) At that time the court also granted Defendants' motion to dismiss those plaintiffs who have been transferred from the Nebraska State Penitentiary—Jerry Bussard, Robert Sams, Terrance Yager, James Wichman, and Robert Costello—and Defendants' oral motion to dismiss those defendants who are no longer employees at the Nebraska State Penitentiary—Gary Grammer, Robert Houston, and Dean Naylor. (Filing 98; Tr. 3:19–4:3, 5:10–6:21.) The court had also previously dismissed without prejudice plaintiffs Otha Hart, William Durand, and Colin Allen for failure to pay the required filing fee. (Filing 39; *see also* Filing 30 (granting plaintiff Durand's motion to dismiss self from case without prejudice).)

## II. ISSUES

The remaining issues for decision[1] are as follows:

1. Whether the NSP has denied Asatru members funding in amounts that are equal to other religions, and whether such denial conforms to the standards set forth in RFRA.

2. Whether the NSP has denied Asatru members funds in amounts that are equal to other religions for religious purposes, study, and ritual, and whether such denial conforms to the standards set forth in RFRA.

3. Whether the NSP has denied Asatru members funds for religious food or services, and whether such denial conforms to the standards set forth in RFRA.

4. Whether the NSP has denied group ritual to Asatru members on death row, and whether

---

**1.** The remaining issues for decision are those outlined in the pretrial conference order (filing 95), as narrowed by Plaintiffs' brief and by the court's granting of various motions during the course of trial. While the pretrial conference order listed 31 items for the court to consider related to Plaintiffs' sincere religious beliefs (filing 95 at 5–7) and conformance to the standards set forth in RFRA, Plaintiffs' brief narrows that list down to the items listed above (Pls.' Closing Argument Br. at 2–3). Further, at the end of Plaintiffs' case, the court granted Defendants' motion pursuant to Fed.R.Civ.P. 50(a) as to the following issues originally appearing in the pretrial conference order (Filing 95 at 31–34 & 36–37; Tr. 178:14–184:22):

1. Whether Plaintiffs sincerely believe that the following items and allowances are needed to practice the Asatru religion:

a. Daily access to that portion of the NSP courtyard that has been designated for Asatru worship.

b. The following items:

1. An evergreen tree.

2. A charm necklace depicting the Asatru religious symbol of Thor's Hammer.

3. A small stone altar for each member to use in his individual cell.

4. A small wooden bowl for each member to use in his individual cell.

5. A cauldron.

6. A drinking horn for each member.

7. An evergreen branch for each ceremony.

8. An ash spear with a rubber head.

9. Viking-type swords made of soft wood.

10. A sauna.

c. A group hobby card in order to make religious items.

d. Ability to purchase and sacrifice goods into the fire, or to sacrifice goods purchased by the state.

e. Meats for ritual, including goat, horse, ram, goose, pork, rabbit, fish, oxen or cattle, and stag or venison. Foods for ritual, including baked goods, apples, nuts, potatoes, cabbage, carrots, mushrooms, onions, eggs, and milk.

f. Allowance to celebrate 23 holidays, 19 of which contain feast meals, including Yule (lasting 12 or 13 days); Thorra-Blot; Disting; Feast of Vali; Ostara; SigrBlot; Walburg Night; May Day; Midsummer; Loaf–Fest; WinterFinding; WinterNights; Feast of Einherjar; and Feast of Ullr.

g. Allowance to form a culture club similar to that of the Native Americans.

h. Allowance to leap over the sacred fire during worship services.

2. Whether the NSP's decision to deny the Asatru group permission to possess the items or perform the activities listed in (1) above conforms to the standards set forth in RFRA.

3. Whether the NSP policy—as set forth in the November 7, 1994, memorandum issued by defendant Harold W. Clarke—of allowing all inmate faith groups one worship service a week, conforms to the standards set forth in RFRA.

4. Whether Plaintiffs are entitled to declaratory and injunctive relief and attorney fees.[2]

### III. FACTS

The facts are essentially these:

1. Plaintiffs John Rust, Leslie Bussard, and Roy Lyman[3] are inmates committed to the Nebraska Department of Correctional Services (DCS) and housed at the Nebraska State Penitentiary (NSP). (Filing 95 at 3.)

---

such denial conforms to the standards set forth in RFRA.
5. Whether the NSP policy of allowing all inmate faith groups one worship time a week denies Asatru members equal time to practice their religion, and whether such denial conforms to the standards set forth in RFRA.
Counsel for Plaintiffs represented to the court during opening statement that allocation of percent of funds was not at issue in this lawsuit. (Tr. 14:1–4.)

**2.** Plaintiffs seek to add the issue of whether they may also be entitled to compensatory damages. (Filing 95 at 37.) Magistrate Judge Piester refused to reinstate Plaintiffs' damage claim based upon the court's prior ruling on Defendants' qualified and Eleventh Amendment immunity from suit for money damages. (*Id.*) At trial I sustained Magistrate Judge Piester's ruling on

the compensatory damages issue. (Tr. 6:7–16.) *See Rust v. Clarke,* 851 F.Supp. 377 (D.Neb. 1994).

**3.** Plaintiff James Harlow was alleged to be an inmate confined at the NSP in Plaintiffs' second amended complaint (filing 46 ¶ 2). Harlow has not been the subject of any subsequent motions to dismiss, but does not appear in the pretrial conference order (filing 95), other than as a potential witness whose whereabouts are not noted in the order, as are the locations of other potential witnesses. (*Id.* at 38.) Because the issues for decision, as outlined in the pretrial conference order, do not include James Harlow, I make no specific findings as to him. (*Id.* at 5–37.) However, the judgment will be binding upon him.

Plaintiff Rust was committed to DCS in 1975. (Tr. 87:3–4.)

2. Defendant Harold W. Clarke is employed by the State of Nebraska as Director of the DCS and has been employed by the DCS since 1974. (Filing 95 at 4; Tr. 185:22–25.) As Director of the DCS, Clarke is responsible for setting policy for the agency. The DCS adopts administrative regulations governing activities within the DCS, and such regulations are sent to various institutions where the policies are tailored to the particular institutions in the form of operational memoranda. (Tr. 190:10–191:2; 370:7–15.)

3. Defendant Frank X. Hopkins has been an employee of the DCS since 1974 and is currently the warden at the NSP. As warden, Hopkins oversees the security and programming of the NSP, a maximum custody level correctional facility, and is responsible for overall operation of the NSP, including inmate classification, budgetary matters, and personnel issues. (Filing 95 at 4; Tr. 368:19–22.)

4. Defendant Mark Rosenau has been an employee of the DCS since 1978 and is currently employed as the religious coordinator at the NSP. (*Id;* Tr. 260:23–25.) Rosenau's duties include overseeing the entire religious program for the NSP, evaluating inmate religious requests, and assisting in drafting and implementing operational memorandum regarding religious programming. (Tr. 233:3–5; 261:12–17; 262:2–5.)

5. Defendant Mario Peart is an employee of the DCS and is currently employed as an associate warden at the NSP. (Filing 95 at 5.)

6. Defendant Kathleen Taylor is an employee of the DCS and is currently employed as the food service director at the NSP. *Id.*)

7. Defendant Mike Kenney is an employee of the DCS and at times relevant to this lawsuit was employed as deputy warden at the NSP. (*Id.* at 4.)

8. The NSP is a maximum custody correctional institution where adult male offenders are assigned. Offenders assigned to the NSP are considered by the DCS to be sophisticated and have criminal records and histories that will not allow the offenders to be placed in lesser custody institutions. (Tr. 188:14–25; 369:7–11.)

9. Plaintiff Rust has been a believer of the Asatru religion[4] for approximately 15 years (Tr. 16:10–12) and has learned about Asatru from books he has purchased or acquired through interlibrary loan (Tr. 17:19–18:14). The Asatru religion has an "umbrella organization," but the organization does not dictate dogma because "there is no set way. It's various to the gods [who are worshipped by the Asatru]." (Tr. 55:7–14.) Accordingly, Rust's deeply-held religious beliefs are based upon his interpretation of information he has read. (Tr. 100:8–11.)

10. Asatru was recognized as a religion at the NSP in 1989. (Tr. 204:3–14; 283:20–22.) There has been an Asatru "kindred"—that is, "[a] group of like individuals that have come together to worship the gods"—at the NSP since at least 1990. (Tr. 18:18–19:12.) Plaintiff Rust has been an active member of that kindred since March 31, 1994, when he got off death row at the NSP. (Tr. 19:8–12.) Each Asatru kindred is autonomous "as far as governing themselves." (Tr. 138:17–18.)

11. At the time of trial, there were approximately 30 to 35 members of the Asatru kindred at the NSP, or four percent of the 805 inmates at the NSP. (Tr. 31:20–21; 278:8–13; 369:12–15; 369:12–15.) Approximately 90 to 100, or 12 to 14 percent, of the inmates at the NSP regularly participate in some form of religious practice, but 600 to 650 of the inmates claim a religious background. (Tr. 318:6–20; 328:9–12.) There are 22 different religions recognized at the NSP, with one of those 22 being all protestant religions combined. (Tr. 195:17–22; 267:24–268:2.) These 22 denominations include Islam, Native American, Mormon, Jehovah Witness, Buddhist, Wicca, and Asatru, with the remainder falling under the umbrella of Christianity. (Tr. 360:1–16.)

12. Asatru is a religion characterized by the attainment of the "nine noble virtues," consisting of courage, truth, honor, fidelity,

---

4. The parties do not dispute that Asatru is a recognized religion. (Tr. 13:16–19.)

discipline, hospitality, perseverance, self-reliance, and industriousness.[5] (Tr. 19:16–20:5.) To attain these virtues, members of the Asatru faith must communicate with one, some, or all of 24 different gods and goddesses. (Tr. 20:3–15.) Under Asatru, "every living thing" also has a right or spirit that is to be honored (Tr. 20:8–10), and each day of the week is sacred to a god, goddess, or living thing.[6] (Tr. 21:4–11.)

13. On a daily basis, members of the Asatru religion typically honor particular gods and goddesses at a small altar with a blessing bowl. (Tr. 21:17–25.) Each Asatru member may worship a different set of deities because which gods and goddesses each member worships depends upon "who the god speaks to." (Tr. 89:12–14.) Similarly, each Asatru may have a different day of worship, depending upon which gods or goddesses each person honors. (Tr. 89:12–90:1.) The Asatru religion is such that one has "a choice on how your religious belief leads you to honor the gods." (Tr. 160:9–13.)

14. At different times throughout the year, 23 different Blots are given, 19 of which involve sacrificial feast meals. (Tr. 21:25–23:22; 26:3–7.) "Blot" means "blessing" in English, and is analogous to a holy day or holy time. (Tr. 22:3–15.) Blots without a sacrificial feast meal involve a two-hour ceremony on the Asatru sacred land at the NSP and require use of a "sacred fire," certain readings, and drinking horns. (Tr. 23:23–25:2; 35:19–22.) Blots with feast meals should, according to the Asatru religion, involve animal sacrifice, preparation, and consumption on the sacred land, as well as an altar, blessing bowl, evergreen sprig, cauldron, and sacred fire (Tr. 22:21–23:5; 25:3–26:2). The Asatru believe that sacrificial feast meals are "in direct apposition to the Christian sacrament of the Holy Eucharist." (Tr. 23:7–8.) There is currently a 40–square–foot portion of land at the NSP which is set aside for Asatru worship. (Tr. 27:22–29:12; 225:15–20.)

15. The Asatru at the NSP believe that the following items and practices are a central part of practicing the Asatru religion: a yew tree on the Asatru sacred land at the NSP (Tr. 27:13–21; 29:15–30:5); a stone altar, small wooden bowl, and god posts in each Asatru member's cell (Tr. 33:17–34:10; 36:16–20; 91:16–93:10; 124:8–15); a drinking horn for all members (Tr. 36:5–15); a cauldron in which to prepare feast meals and mead (Tr. 36:21–37:14); evergreen branches or sprigs for use during ceremonies (Tr. 37:15–38:22); a six-foot wooden spear with a rubber tip (Tr. 41:17–43:6); a sauna for purifying the body (Tr. 43:24–44:14); the ability to sacrifice and consume particular foods in connection with Blot sacrificial feast meals (Tr. 53:20–54:18); a symbol depicting Thor's Hammer (Tr. 68:22–69:10); a wooden Viking-type sword with rubber edges (Tr. 70:1–71:1); the ability to sacrifice food into the sacred fire (Tr. 71:2–16); ability to "jump the fire" as a cleansing ceremony on certain festival days (Tr. 71:17–72:1); and the ability to attend all worship services required by the Asatru religion, not just one service weekly, as set forth in current NSP policy (Tr. 74:19–77:12). The list of requests submitted to the NSP by Asatru inmates has expanded over time and is ever-changing as far as priorities are concerned. (Tr. 293:21–294:15.)

16. The NSP allows Asatru inmates to possess the following items or engage in the following activities: evergreen branches for rituals (Tr. 117:6–15); a kettle from the kitchen in which to mix a mead substitute (Tr. 117:16–118:9); one drinking horn—which was made by an Asatru who is a member of the NSP hobby association—to share among all members and allowance to take each member's own cup to the worship site (Tr. 123:11–124:7; 134:17–25); bowls purchased from the canteen for use in each Asatru inmate's cell (Tr. 124:8–17); one religious medallion that does not resemble a swastika (Tr. 132:1–10; 305:3–4); a blessing bowl, ceremonial hammer, bronze arm ring, altar, ev-

---

**5.** Plaintiff Rust testified about the Asatru religion as he interprets it and the NSP's actions regarding Plaintiffs' religious requests. Rust testified on behalf of all Plaintiffs, who agreed to be bound by Rust's testimony. (Tr. 145:13–146:8.)

**6.** Rust testified that Tyr is honored on Tuesday; Othin on Wednesday; Thor on Thursday; Freij on Friday; Loki on Saturday; Sunday is sacred to Sunna, or the sun; and Monday is sacred to the moon. (Tr. 21:4–11.)

ergreen branch, antler, fire, and rune staff at the Asatru worship site, which they are allowed to visit once a week and during special services throughout the year (Tr. 133:7–134:2; 153:8–154:14; 289:1–25; 304:1–8; Pls.' Ex. 106); permission to purchase goods at the canteen to sacrifice in the fire (Tr. 135:1–7); and permission to smudge themselves with ashes from the sacred fire as an alternative to jumping the fire (Tr. 140:22–141:3; 222:7–13; 311:3–7). The Asatru also have a 100–volume religious library in defendant Rosenau's office. (Tr. 275:5–19.)

17. Religious programming at the NSP focuses on worship, religious education, and special programs. (Tr. 272:2–9.) On November 7, 1994, Harold Clarke issued a memorandum to all inmates setting forth the DCS's revised policies regarding religious program offerings. (Ex. 2 at 1–2; Tr. 191:6–192:1.) Such changes were recommended by the Religion Study Committee, which was formed in 1994 to identify areas in which improvements were necessary regarding religious programming. The committee reviewed the various faith groups represented in DCS facilities to ensure that decisions regarding religious services and opportunities were being made with consistency, equity, and within the DCS' resources. (Pls.' Ex. 2 at 1; Tr. 192:20–193:4; 194:7–10; 262:24–264:19; 371:9–372:2.) Prompting the policy changes which were recommended by the Religion Study Committee were a growing number of requests from different inmate religious groups to upgrade their programs in terms of space and resources. (Tr. 192:11–18.) In forming these policy changes, the committee contacted or attempted to contact people outside the correctional institutions in order to determine commonly accepted religious practice and standards in society at large. (Tr. 194:17–195:9; 265:22–266:15.)

18. The revised policy changes at issue are as follows [7]:

1. Members of all faiths will be permitted a weekly opportunity for worship. Additionally, a weekly period will be allowed for religious education. An effort will be made to make the time allotted for these activities comparable among the various religious faith groups within each institution, while considering the tenets of each faith, common community practice, and multi-denominational aspects of the various faiths. Special programs will continue to be allowed, with time allotted to such programs to be determined on a case-by-case basis, while considering the tenets of each faith, the multi-denominational aspects of the various faiths, as well as security concerns and institutional limits.

. . . .

3. Faith groups will continue to be allowed to have meals, from the main line, on significant religious days based on religious tenets and community practice, e.g., Ramadan, Id Feasts, Medicine Man visits, etc. Food Service menus will include a variety of foods reflective of various cultures and traditions. With sufficient advance notice, menus can be changed to accommodate a specific need on a specified date. All inmate foods can be provided from the main line[,] improving efficiency and safety in our kitchens.

(Pls.' Ex. 2 at 1–2.) In essence, the policy allows one weekly worship service, one religious educational period, and special religious programs which are reviewed on a case-by-case basis. (Tr. 272:13–17; 373:8–11.)

As a result of the policy, the Asatru are allowed a two-hour worship service on Thursday of each week—their day of preference— as well as a weekly two-hour educational session. (Tr. 354:15–356:11.) Pursuant to the policy, other special programs are also available upon written request to NSP staff, which are reviewed on a case-by-case basis. (Tr. 373:17–374:1.)

---

7. A policy not at issue provides that menus will be served so that inmates can abstain from religiously prohibited foods without jeopardizing nutritional adequacy under Recommended Daily Allowances standards. (Ex. 2 at 1.) This concept is called "common fare" and has existed for several years in the Federal Bureau of Prisons. Under this approach, members of known religious faiths can partake of meals without violating their religious tenets and without sacrificing necessary nutritional elements. (Tr. 197:8–199:2.)

19. Some inmate faith groups have requested that they be allowed to worship daily because other inmate faith groups were allowed to worship daily. (Tr. 195:13–16.) Allowing daily worship by all faith groups at the NSP would require "around-the-clock, all-week scheduling." (Tr. 196:16–20.) When scheduling worship services, each NSP program must be contacted—such as club activities, athletics, recreation, and custody department activities—because the NSP has a fixed number of available spaces in which to conduct religious services and activities. (Tr. 273:14–24.) The compromise reached by the committee, and set out in policy (1) in paragraph (18), above, has resulted in reduced worship time for Muslims, Native Americans, and members of Asatru housed at the NSP. (Tr. 196:21–197:7; 280:18–21.)

20. Rust admits that policy (3) in paragraph (18), above, would permit Asatru inmates to request, with sufficient notice, that any menu item appearing on the menu cycle be served for the Asatru feast meals. (Tr. 174:21–175:11.) The DCS will consider such requests in the context of space, human resources, and time constraints, as well as the centrality of the particular practice to the group's religion. (Tr. 259:5–17.) The reasons for this policy change were the economics and waste involved in operating separate kitchens or food preparation areas to satisfy all religious food needs; allowing various faith groups to prepare their own food to accommodate their religious needs raised space, sanitation, equality, supervision, staffing, and theft issues; and the prior practices of allowing inmates to purchase foods and permitting donated food for particular occasions became unmanageable and akin to an inmate competition. (Tr. 199:12–200:15; 197:13–23; 269:2–271:5.)

21. The DCS does not receive all the state funds they request, and the agency must prioritize spending. Since the primary responsibility of DCS is protection of the public, the top priority of the DCS is ensuring that institutions have adequate surveillance and security measures. (Tr. 200:25–201:12.) While religious programming is "very important" to the DCS and is offered to all inmates housed within the department, the DCS is responsible for "managing limited resources of space, time, personnel, funds, etc., and while we may want to do a lot more than we are doing, those limitations are real." (Tr. 201:13–15; 202:2–4; 202:22–24, Testimony of Harold Clarke.) The DCS takes decisions regarding religious practice "very seriously [because] . . . religion plays a very important role in the process of habilitation and rehabilitation, but we [DCS] also recollect our limitations, and we cannot be all things to all people." (Tr. 258:4–9, Testimony of Harold Clarke.)

We get many requests from all of the different faith groups as the penitentiary for different worship articles. Most years, the requests provided by Asatru exceed the budget that they are allowed to have. There is always the situation of what's priority, what's needed, what's available, how are the few dollars that are available in our budget within the State best utilized to serve that faith group.

(Tr. 338:13–19, Testimony of Mark Rosenau.)

22. In making religious decisions involving inmates, such as requests for more worship time or feast meals, the DCS must consider how that decision will impact the institution as a whole. "[W]e have to take a look at our ability to provide that opportunity on a wide scale." (Tr. 206:12–24, Testimony of Harold Clarke.) When such a request is received, DCS staff must consider whether they would be able to extend the same opportunities or services to all others who will likely make similar requests. (Tr. 207:2–16; 281:19–282:9; 383:21–384:13.) "[I]t's important that we fight . . . to maintain that consistency, that equal opportunity, equal access. To do otherwise, I think, would be discriminating, unduly so." (Tr. 208:10–13, Testimony of Harold Clarke.) "[I]f we had separate programming for each distinctive denomination, we just simply don't have the facility and the resources to be able to accommodate all of the worship, religious education, and special programs that would be asked for." (Tr. 279:1–5, Testimony of Mark Rosenau.) With 805 inmates and 22 known religious denominations at the NSP, it is impossible to meet every individual's preference with regard to religious requests.

[W]hen you have that many individuals involved in that many different religions, ... there are endless preferences people may have or develop relevant to how they want to practice their faith or worship, and I think it would be impossible to accommodate each and every one of those preferences. I do not see how it can be done. (Tr. 376:9–20, Testimony of Frank Hopkins.)

23. With regard to the items requested by the Asatru at the NSP, the DCS has denied such requests for the following reasons:

a. *An evergreen tree.* Trees can be used to form weapons, to conceal items, and to block the ability of staff to observe supervised areas. (Tr. 208:20–209:5.) If a tree was planted on the Asatru land at the NSP, officers would be required to search the tree itself, the base of the tree, and the roots of the tree each time an Asatru member used the land. (Tr. 210:4–7; 255:5–10; 397:6–19.) A tree on the Asatru land could also be used by inmates to access the roof of a nearby building and the fence that sits nearby. (Tr. 210:16–211:2.)

b. *A charm necklace depicting the Asatru religious symbol of Thor's Hammer.* While the Asatru at the NSP have been allowed to possess religious medallions depicting symbols which resemble an anchor or sunwheel, they are not allowed to possess items which depict a swastika. Many religious sects and races at the NSP may find such a symbol offensive and such a symbol would cause tensions between various groups housed at the NSP. (Tr. 211:3–212:22; 305:8–19; 400:25–403:17.)

c. *A small stone altar for each member to use in his individual cell.* Stone structures can be used as weapons and can be used to form weapons, damage property, conceal items, and facilitate escape. (Tr. 213:1–8; 404:6–18.)

d. *A small wooden bowl for each member to use in his individual cell.* Personal cups and bowls may be purchased from the canteen. (Tr. 213:12–16.) When all inmates are currently offered plastic bowls, the DCS does not see a need for expanding the canteen inventory to carry different makes of bowls. "[W]e have a department with over 2,600 offenders that have requests that they will all have to have certain items. As we review these items, these requests, we need to make a determination as to whether or not we are going beyond what's necessary or what's needed." (Tr. 240:22–241:5, Testimony of Harold Clarke.) Further, wooden bowls can be carved and used to conceal items, and there is a greater opportunity to misuse and alter wooden bowls, as compared to plastic ones. (Tr. 255:22–256:2.)

e. *A cauldron.* Since inmates are not allowed to prepare meat and food on NSP grounds, and a cauldron would be used for such purposes, a cauldron is unnecessary. (Tr. 306:24–307:10.) In light of budgetary concerns and the prohibited purpose for which a cauldron would be used, a cauldron would not be the highest priority or best utilization of available funds. (Tr. 338:19–23.)

f. *A drinking horn for each member.* Such items could be used as weapons and to conceal items. Each horn would have to be searched after each use for concealed items, and the shape of drinking horns makes it easier to conceal contraband. With such increased search duties, mistakes are possible, allowing hidden items to go undetected. Contraband has been found in even the most restrictive unit at the NSP, where searches are performed repeatedly. (Tr. 214:4–215:22; 242:3–15; 406:18–407:10.)

g. *An ash spear with a rubber head.* Six-foot spears, as requested by the Asatru inmates, could be used as weapons despite rubber tips. Guards observing such items from a tower would not perceive such spears to have rubber tips, leading to confusion and misuse. Further, rubber can easily be removed or otherwise altered. (Tr. 216:11–217:3.)

h. *Viking-type swords made of soft wood.* Swords in a maximum-security institution have a great potential for abuse and use as weapons. Allowance of such

items would create an increased security burden on the DCS and NSP. (Tr. 217:21–218:23; 409:14–410:13.)

i. *A sauna.* The Asatru have not indicated that such an item is central or necessary to their religion. (Tr. 219:9–18; 251:21–252:3; 309:9–20; 410:16–21.)

24. With regard to other allowances requested by the Asatru inmates at the NSP, the following have been denied by the NSP for the following reasons:

a. *Daily access to that portion of the NSP courtyard that has been designated for Asatru worship.* Daily visitation to this high-security area would create a strain on the NSP's resources which would vary depending upon the time of day such access was allowed. Further, Asatru inmates would have to be released from their jobs or school for such daily access. Similar requests from other religious groups wanting daily access to their areas have been denied. (Tr. 394:22–396:9.)

b. *A group hobby card in order to make religious items.* No group at the NSP is allowed a group hobby card, as membership in the hobby organization is on an individual basis. No individual Asatru inmates have been denied permission to put their names on the list to be considered for membership in the hobby organization. A hammer and staff used for Asatru worship have been made by Asatru members who have participated in the hobby organization on an individual basis, and such members are also allowed to make runes. (Tr. 411:2–412:7.)

c. *Ability to purchase and sacrifice goods into the fire, or to sacrifice goods purchased by the state.* It is not the state's responsibility to provide items, with state resources, to inmates to be disposed of in this fashion. However, inmates can purchase items at the canteen for sacrifice and can buy meals off the main food line at the NSP for sacrifice. (Tr. 220:11–221:7; 413:1–18.)

d. *Allowance to celebrate 23 holidays, 19 of which contain feast meals, including Yule (lasting 12 or 13 days); Thorra-*

*Blot; Disting; Feast of Vali; Ostara; SigrBlot; Walburg Night; May Day; Midsummer; Loaf-Fest; WinterFinding; WinterNights; Feast of Einherjar; and Feast of Ullr.* While under the new policy, described above, such requests will be reviewed on a case-by-case basis, providing that number of feast meals to the Asatru will provoke similar requests from other groups of inmates and will cause space and time concerns, as discussed above. (Tr. 221:8–222:1.) The new policy "is written in such a fashion to make allowances for those things to occur, providing it can be shown that they are necessary and central to the religious practice." (Tr. 254:17–21, Testimony of Harold Clarke.)

e. *Allowance to form a culture club similar to that of the Native Americans.* Culture clubs are rehabilitative in nature with a purpose of educating the NSP population about minority cultures in society in order to help instill pride in members of racial or ethnic minorities. These clubs are used to gain self-betterment, awareness of different ethnic groups, and an opportunity to discuss issues and engage in activities pertinent to that club. The NSP does not allow culture clubs to overlap with religious programming, and the clubs that exist at the NSP do not have a religious purpose. (Tr. 377:14–383:20; Pls.' Ex. 1, Letter from Frank Hopkins to Les Bussard dated Oct. 23, 1991.)

f. *Allowance to leap over the sacred fire during worship services.* Safety concerns require that this request be denied, especially since the Asatru fire pit has been enlarged over time and since an Asatru inmate who jumped over the fire without authorization injured his ankle. (Tr. 222:2–223:25; 340:2–23; 414:3–5; Pls.' Exs. 120–121 & 130.) According to information supplied to the NSP by Asatru members, the Asatru are permitted to "smudge" as an alternative to jumping the fire. (Tr. 414:6–12.) Further, "it's a means that could be used by some offenders to control others. If an offender is burned in that fire as a result of the action of others, that's a responsi-

bility, in my summation, that the facility has. . . . We have seen other types of programs abused to control other inmates' behavior." (Tr. 250:4–13, Testimony of Harold Clarke.)

25. Defendant Rosenau does not question the sincerity of plaintiff Rust's religious practice or belief. (Tr. 315:2–3.)

26. The NSP has "accepted" 25 proposed special religious days for Asatru inmates in 1995 and will allow Asatru inmates "some special program" for each day. (Tr. 356:15–357:6; Pls.' Ex. 1, Memo from Rosenau to Rust dated Dec. 7, 1994.) Such inmates are to give 30 days advance notice for proposed activities which would include a meal and 14 days advance notice for activities without a meal. (Tr. 357:7–13; Pls.' Ex. 1, Memo from Rosenau to Rust dated Dec. 7, 1994.) Special events will not be approved if the event conflicts with regular work schedules (Tr. 357:14–358:4), and only four feast meals will be allowed pursuant to current NSP policy. (Tr. 358:5–359:25.) Such policy is currently under study and review. (*Id.*)

## IV. LAW

### A. Applicable Law

In order to recover under § 1983, Plaintiffs must establish: (1) a deprivation of rights, privileges, or immunities secured by the Constitution or laws of the United States; and (2) that such deprivation was committed by a defendant acting under the color of state law. 42 U.S.C. § 1983; *Reed v. Woodruff County*, 7 F.3d 808, 810 (8th Cir.1993); *Jones v. Gutschenritter*, 909 F.2d 1208, 1211 (8th Cir.1990). Further, a defendant's liability under § 1983 "requires a causal link to, and direct responsibility for, the deprivation of rights." *Madewell v. Roberts*, 909 F.2d 1203, 1208 (8th Cir.1990).

Plaintiffs in this case allege a deprivation of their right to freely exercise their religion, a right secured by the First Amendment and the Religious Freedom Restoration Act of 1993, 42 U.S.C. §§ 2000bb to 2000bb–4 ("RFRA").[8]

RFRA purports to "restore the compelling interest test" as articulated in *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963)[9], and *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972)[10], and to make such test applicable in "all cases where free exercise of religion is substantially burdened." § 2000bb(b)(1). RFRA includes Congress' express findings that *Employment Division v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876

---

**8.** As previously stated, the parties in this case have agreed that this lawsuit shall be decided on the standards set out in RFRA (Order on Final Pretrial Conference, Filing 95 at 22). *See* Fed. R.Civ.P. 16(e) (final pretrial conference order controls subsequent course of the action unless modified by subsequent order).

**9.** The Court in *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), found violative of the First and Fourteenth Amendments a state unemployment compensation statute which operated to deny benefits to a Seventh–Day Adventist who declined to accept available work on Saturdays, as her faith mandated. The Court considered whether the disqualification for benefits imposed a burden on the appellant's free exercise of religion, *id.* at 403, 83 S.Ct. at 1793, and whether a compelling state interest justified the substantial infringement of appellant's First Amendment rights, *id.* at 406, 83 S.Ct. at 1795. The Court also noted that even if some state interests existed, "it would plainly be incumbent upon the appellees to demonstrate that no alternative forms of regulation would combat such abuses without infringing First Amendment rights." *Id.* at 407, 83 S.Ct. at 1796.

**10.** In *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), the Court held that the state could not, consistent with the First and Fourteenth Amendments, compel members of the Old Order Amish religion and the Conservative Amish Mennonite Church to send their children to public or private school until age 16 pursuant to the state's compulsory school-attendance law. The Court stated that "only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion." *Id.* at 215, 92 S.Ct. at 1533. The Court noted that the evidence in this case established an identifiable religious sect having a long history of success and self-sufficiency and sincere religious beliefs; an interrelationship between belief and mode of life; the vital role of belief and daily conduct in the sect's religious community; the hazards caused by the state's compulsory school-attendance law as applied to this religious group; and the adequacy of this religious sect's alternative mode of continuing vocational education. *Id.* at 235, 92 S.Ct. at 1543.

(1990) [11], "virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion," § 2000bb(a)(4), and that the compelling interest test, as set forth in prior cases such as *Sherbert* and *Yoder*, "is a workable test for striking sensible balances between religious liberty and competing prior governmental interests." [12] § 2000bb(a)(5).

RFRA provides in relevant part:

**§ 2000bb–1. Free exercise of religion protected**

**(a) In general**

Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

**(b) Exception**

Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

§ 2000bb–1.

RFRA may be used as a "claim or defense" in judicial proceedings, § 2000bb–1(c),

and creates a new standard of review for free exercise of religion claims. *Brown–El v. Harris*, 26 F.3d 68, 69 (8th Cir.1994) (RFRA creates "a new standard of review for claims that governmental action restricts the free exercise of religion"); *Woods v. Evatt*, 876 F.Supp. 756, 1995 WL 53170, at *4 (D.S.C. Jan. 24, 1995) ("RFRA is both a new cause of action and a revised standard of review for claims brought under other statutes, such as § 1983, where the claims involve a denial of constitutionally guaranteed religious freedom"). Further, RFRA applies retroactively. § 2000bb–3(a); *Werner v. McCotter*, 49 F.3d 1476, 1479 (10th Cir.1995); *Brown–El*, 26 F.3d at 69.

■ RFRA applies to prisoners' claims involving alleged restrictions on the free exercise of their religion, *Werner*, 49 F.3d at 1479; *Bryant v. Gomez*, 46 F.3d 948, 949 (9th Cir.1995); *Rust v. Clarke*, 851 F.Supp. 377, 380 (D.Neb.1994), and was intended to supersede the "reasonableness" standard of review for prison regulations claimed to inhibit the exercise of constitutional rights as set forth in *O'Lone v. Estate of Shabazz*, 482 U.S. 342,

**11.** *Employment Division v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), involved whether the state of Oregon could, consistent with the Free Exercise Clause of the First Amendment, deny unemployment compensation benefits to members of the Native American Church who ingested peyote for sacramental purposes at a religious ceremony and were dismissed from their jobs because of such religious use of the drug. The Court found that if prohibiting or burdening the exercise of religion is the incidental effect of a generally applicable, religion-neutral law, the First Amendment has not been offended and such law need not be justified by a compelling governmental interest. *Id.* at 878 & 886 n. 3, 1599 & 1604 n. 3.

**12.** Neither party has questioned the constitutionality of RFRA, and it is therefore not an issue before the court. *See Canedy v. Boardman*, 16 F.3d 183, 186 n. 2 (7th Cir.1994) (although not an issue before it, the court noted, "The constitutionality of [RFRA] ... raises a number of questions involving the extent of Congress's powers under Section 5 of the Fourteenth Amendment." (citing sources)); *Flores v. City of Boerne*, 877 F.Supp. 355 (W.D.Tex., 1995) (finding RFRA un-

constitutional on separation of powers grounds; staying trial pending outcome of interlocutory appeal of issue to Fifth Circuit Court of Appeals).

The constitutionality of RFRA aside, the practicality of applying "the compelling interest test" in the prison context is questionable. As the Court stated in *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 2262, 96 L.Ed.2d 64 (1987):

Subjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration. The rule would also distort the decisionmaking process, for every administrative judgment would be subject to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the problem at hand. Courts inevitably would become the primary arbiters of what constitutes the best solution to every administrative problem, thereby "unnecessarily perpetuat[ing] the involvement of the federal courts in affairs of prison administration." *Procunier v. Martinez*, 416 U.S. [396], at 407, 94 S.Ct. [1800], at 1808 [40 L.Ed.2d 224 (1974)].

107 S.Ct. 2400, 96 L.Ed.2d 282 (1987).[13] S.Rep. No. 111, 103rd Cong., 1st Sess. 9–10 (1993), *reprinted in* 1993 U.S.C.C.A.N. 1892, 1898–1901 (RFRA to establish one standard for testing claims of government infringement on religious freedom; special exemption for prison free exercise of religion claims unnecessary; single test to be interpreted "with regard to the relevant circumstances in each case").

Thus, Plaintiffs cannot prevail in this action unless Defendants have (1) substantially burdened Plaintiffs' exercise of religion (2) without a compelling governmental interest (3) which is furthered by the least restrictive means.

### 1. Substantial Burden

In a § 1983 action in which an inmate sought to require the prison to provide full religious Pentecostal services, the court stated that in order to establish a "substantial burden" on one's exercise of religion under RFRA, the plaintiff must prove that the government's action prevents him or her " 'from engaging in conduct or having a religious experience which the faith mandates. This interference must be more than an inconvenience; the burden must be substantial and an interference with a tenet or belief that is central to religious doctrine.' " *Bryant v. Gomez,* 46 F.3d 948, 949 (9th Cir.1995) (quoting *Graham v. C.I.R.,* 822 F.2d 844, 850–51 (9th Cir.1987), *aff'd sub nom. Hernandez v. Commissioner,* 490 U.S. 680, 699, 109 S.Ct. 2136, 2148, 104 L.Ed.2d 766 (1989)).

In another § 1983 action applying RFRA in the prison context, the court in *Werner v. McCotter,* 49 F.3d 1476, 1479–80 (10th Cir. 1995), stated that in order to establish a "substantial burden" under RFRA, the government action "must significantly inhibit or constrain conduct or expression that manifests some central tenet of a prisoner's individual beliefs; must meaningfully curtail a prisoner's ability to express adherence to his or her faith; or must deny a prisoner reasonable opportunities to engage in those activities that are fundamental to a prisoner's religion." *Id.* (internal citations omitted).

### 2. Compelling Governmental Interest

After the plaintiff proves the existence of a substantial burden on his or her exercise of religion, the burden then shifts to the government to establish that the challenged action or policy furthers a compelling state interest in the least restrictive manner. *Id.* at n. 2.

While courts should give " 'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources,' " *id.* at 1479–80 (quoting S.Rep. No. 111, 103rd Cong., 1st Sess. 10 (1993), *reprinted in* 1993 U.S.C.C.A.N. 1892, 1900), " 'only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion.' " *Id.* (quoting *Wisconsin v. Yoder,* 406 U.S. 205, 215, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972)). " '[I]nadequately formulated prison regulations and policies grounded on mere speculation, exaggerated fears, or post-hac rationalizations will not suffice to meet the [A]ct's requirements.' " *Campos v. Coughlin,* 854 F.Supp. 194, 207 (S.D.N.Y.1994) (quoting S.Rep. No. 111, *supra,* at 1900).[14]

To establish an interest of the "highest order," the state must do more than simply assert in a conclusory fashion that a limita-

---

**13.** The Court in *O'Lone* articulated this standard as follows: " '[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.' " *O'Lone,* 482 U.S. at 349, 107 S.Ct. at 2404 (quoting *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987)). *O'Lone* involved a prison policy which resulted in Islamic prisoners' inability to attend a weekly Muslim congregational service.

**14.** However, RFRA was intended to establish a standard "that is flexible enough to serve the unique governmental interests implicated in the prison context. Accordingly, the committee finds that application of the act to prisoner[ ]free exercise claims will provide a workable balancing of the legitimate interests of prison administrators with the Nation's tradition of protecting the free exercise of religion." S.Rep. No. 111, 103rd Cong., 1st Sess. 10 (1993), *reprinted in* 1993 U.S.C.C.A.N. 1892, 1900.

tion on one's free exercise of religion is required for health, safety, or security reasons. *Werner,* 49 F.3d at 1479 (citing *Weaver v. Jago,* 675 F.2d 116, 119 (6th Cir.1982), which is quoted with approval in S.Rep. No. 111, *supra,* at 1899). In the prison context, compelling governmental interests include orderly and safe operation of prisons. *See Phipps v. Parker,* 879 F.Supp. 734 (W.D.Ky.1995) (under RFRA, forcing prisoner, who was orthodox Hasidic Jew, to receive "burr" haircut while in segregation unit was justified by compelling safety interests of quick identification of inmates and protection of guards and inmates from hidden contraband); S.Rep. No. 111, *supra,* at 1901.

### 3. Least Restrictive Means

In addressing the "least restrictive means" portion of the RFRA standard, the *Phipps* court, *id.,* found that forcing prisoners in the segregation unit to receive "burr" haircuts was justified by compelling safety concerns furthered by the least restrictive means since haircutting was the "only plausible way to meet these safety concerns," and other methods of furthering the same safety interests would be "impractical" and unrealistic. *Id.* at 736.

### B. Application of Law to Facts

### 1. Substantial Burden

■ Defendants argue, almost exclusively, that they have not substantially burdened Plaintiffs' exercise of religion because Defendants' actions did not pressure Plaintiffs to commit acts forbidden by their religion or prevent them from engaging in conduct which the Asatru faith mandates. (Defs.' Post–Trial Br. at 33–38; Defs.' Reply Br. at 1–5.) Citing various books which describe the Asatru religion (Pls.' Ex. 4), Defendants question the manner in which the Asatru inmates at the NSP practice, or seek to practice, their faith. Because these various sources mention alternatives to the manner in which the Asatru inmates at the NSP wish to practice their religion, Defendants argue

that the methods of worship used by Plaintiffs are unnecessary and, thus, Defendants' actions regarding Asatru religious requests do not substantially burden Plaintiffs' exercise of their religion. (Defs.' Reply Br. at 1–5.)

> Intrafaith differences ... are not uncommon among followers of a particular creed, and the judicial process is singularly ill equipped to resolve such differences in relation to the Religion Clauses. One can, of course, imagine an asserted claim so bizarre, so clearly nonreligious in motivation, as not to be entitled to protection under the Free Exercise Clause; but that is not the case here, and the guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect. Particularly in this sensitive area, it is not within the judicial function and judicial competence to inquire whether the petitioner or his fellow worker more correctly perceived the commands of their common faith. Courts are not arbiters of scriptural interpretation.

*Thomas v. Review Bd. of Indiana Employment Sec. Div.,* 450 U.S. 707, 715–16, 101 S.Ct. 1425, 1430–31, 67 L.Ed.2d 624 (1981) (free exercise case involving denial of unemployment compensation benefits to a Jehovah's Witness who terminated job because religious beliefs prohibited participation in production of armaments; compelling interest/least restrictive means test used). *See also Werner v. McCotter,* 49 F.3d 1476, 1479 n. 1 (10th Cir.1995) (citing *Thomas* in relation to RFRA case involving inmate plaintiffs and stating that "A plaintiff ... need not hew to any particular religious orthodoxy; it is enough for the plaintiff to demonstrate that a government has interfered with the exercise or expression of her or his own deeply held faith").

As stated above, this court is simply not suited to announce the "correct" interpretation of Asatru religious literature or the "proper" way to practice the Asatru religion.[15] Therefore, I find and conclude that

---

15. As pointed out in Plaintiffs' closing argument brief,

> Asatru is a non-authoritarian and decentralized religion. They have no popes and no

bishops. There are written sources which believers use because they contain sacred lore in the form of myths and examples of conduct, but they do not accept them as infallible or

Plaintiffs' religious beliefs are sincere, and I will assume that Defendants' denials of Plaintiffs' requests and Defendants' November 7, 1994, policy regarding weekly worship time interfere with beliefs that are central to Plaintiffs' religious doctrine, thereby substantially burdening Plaintiffs' exercise of religion under RFRA.

### 2. Compelling Governmental Interest

■ The evidence presented at trial, as set forth in my findings of fact above, establishes that Defendants consider religious requests and policies very seriously because of the important role religion plays in the rehabilitation process. Indeed, the DCS Religion Study Committee was formed in 1994 to ensure that such religious decisions and policies were being made with consistency, equity, and within the DCS' resources, and to identify improvements which could be made in religious programming. Such programming at the NSP includes opportunities for worship, religious education, and special programs.

Each inmate religious request at the NSP requires Defendants to analyze their ability to provide the requested item or allowance to everyone who requests it, while keeping in mind space, time, personnel, and funding limitations. Spending at the NSP, which is a maximum custody correctional institution housing sophisticated inmates having criminal histories, must be prioritized since financial resources are finite and other priorities require more funding, such as adequate surveillance and security systems.

At the time of trial there were 805 inmates at the NSP. Approximately 90 to 100, or 12 to 14 percent, of the inmates at the NSP regularly participate in some form of religious practice, but 600 to 650 of the inmates claim a religious background. There are 22 different religions recognized at the NSP, with one of those 22 being all protestant religions combined. Further, the number of requests from NSP inmate religious groups

wanting increased space and resources for religious purposes continues to grow.

While "there are endless preferences people may have or develop relevant to how they want to practice their faith or worship," the DCS fights to maintain consistency, equal opportunity, and equal access to the exercise of religion for all inmates at the NSP and other correctional institutions within the DCS. (Tr. 376:9–20, Testimony of Frank Hopkins; Tr. 208:10–13.)

Therefore, I find and conclude that Defendants' denials of Plaintiffs' various religious requests and the Defendants' November 7, 1994, policy regarding worship time 'is in furtherance of a compelling governmental interest—that is, protecting the rights of *all* NSP inmates to freely exercise their religion by equitably allocating finite resources among the numerous denominations represented by the 805 inmates at the NSP. Especially in light of the religious allowances Defendants have given Asatru inmates at the NSP, and the sincere and exhaustive manner in which Defendants approach religious decisionmaking, the decisions and policies made by Defendants with respect to the Asatru inmates at the NSP further an interest of the highest order not otherwise served—broadly and fairly apportioning NSP's space, time, personnel, and monetary resources so that all other inmates may also freely exercise the faith of their choice.

### 3. Least Restrictive Means

■ Because the only plausible way to protect the rights of all NSP inmates to freely exercise their religion is to equitably allocate space, time, personnel, and monetary resources among the numerous denominations and inmates at the NSP, I find and conclude that Defendants' denials of Plaintiffs' various religious requests and the Defendants' November 7, 1994, policy regarding worship time are the least restrictive means of furthering that compelling governmental interest. *See Phipps v. Parker*, 879 F.Supp.

---

inspired documents.... They believe the real source of holy wisdom is inside each individual, passed down from ancestors as instinct, emotion, and innate predispositions. They believe that by combining this insight with the

literature available to them, that they arrive at the religious truth.

(Pls.' Closing Argument Br. at 13–14, citations to transcript omitted.)

734, 736 (W.D.Ky.1995) (forcing prisoners in segregation unit to receive "burr" haircuts was the "only plausible way"—thus, the least restrictive means—of furthering compelling safety concerns).

### V. CONCLUSION

I find and conclude that Defendants' denials of Plaintiffs' various religious requests and the Defendants' November 7, 1994, policy regarding worship time, as outlined in section II of this memorandum, are in furtherance of a compelling governmental interest and are the least restrictive means of furthering that interest. 42 U.S.C. § 2000bb–1(b). Thus, Plaintiffs are not entitled to declaratory and injunctive relief under 42 U.S.C. § 1983, the First Amendment, or the Religious Freedom Restoration Act of 1993 ("RFRA") 42 U.S.C. §§ 2000bb to 2000bb–4.

Accordingly,

IT IS ORDERED that by separate document judgment shall be entered as follows: "Judgment is entered for Defendants and against Plaintiffs providing that Plaintiffs shall take nothing."