Sylvester SASNETT, Lonnie Smith, James Lowery, James Hadley and Barbara Miller, et al., individually and on behalf of others similarly situated, Plaintiffs,

v.

Michael J. SULLIVAN, Secretary, Department of Corrections; Ken Sondalle, Administrator, Division of Adult Institutions; Jeffrey Endicott, Warden, Columbia Correctional Institution; Gary McCaughtry, Warden, Waupun Correctional Institution; Gerald Berge, Warden, Fox Lake Correctional Institution; Kristine Krenke, Warden, Taycheedah Correctional Institution; their agents, assistants, officials, employees, successors and others acting in concert or cooperations with them, Defendants.

No. 94–C–52–C.

United States District Court, W.D. Wisconsin.

Dec. 1, 1995.

As Amended Jan. 9, 1996.

**1432**

Percy L. Julian, Julian, Olson & Lasker, S.C., Madison, WI, for Sylvester Sasnett, Will Highfill, Lonnie Smith, James Lowery, James Hadley, John Casteel, Barbara Miller.

Frank Remington, Wisconsin Dept. of Justice, Madison, WI, for Dept. of Corrections, Michael J. Sullivan, Ken Sondalle, Jeffrey Endicott, Gary McCaughtry, Gerald Berge, Kristine Krenke.

Janis C. Kestenbaum, Theodore C. Hirt, U.S. Dept. of Justice, Washington, DC, for U.S.A.

Marc D. Stern, American Jewish Congress, New York City, for amicus curiae, American Jew. Cong.

## OPINION AND ORDER

CRABB, Chief Judge.

This is a civil action for injunctive and declaratory relief brought pursuant to 42 U.S.C. § 1983 and the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb. Plaintiffs are Wisconsin state prisoners who challenge two internal management procedures regulating the wearing of jewelry and limiting to twenty-five the number of publications inmates are allowed to possess. The internal management procedures prohibit plaintiffs Sylvester Sasnett, Lonnie Smith and Barbara Miller from wearing crosses around their necks and caused plaintiffs Sasnett, James Lowery and James Hadley to relinquish possession of individually owned religious publications. Plaintiffs contend that the enforcement of these procedures violates their rights 1) to free exercise of religion under the First Amendment, by substantially burdening their exercise of religion using a means not rationally related to a legitimate governmental purpose; 2) to free exercise of religion under the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb, by imposing a substantial burden on their practice of religion, in the absence of a compelling governmental interest and without using the least restrictive means of furthering a governmental interest; and 3) to due process under the Fourteenth Amendment by restricting their liberty interest in religious materials and items without affording plaintiffs the process due such deprivation. In addition, plaintiffs contend that defendants' regulations and policies restricting religious exercise are overbroad and facially invalid.

The case is before the court on the parties' cross motions for summary judgment. In an opinion entered June 23, 1995, *Sasnett v. Department of Corrections*, 891 F.Supp. 1305 (W.D.Wis.1995), I considered defendants' contention that the Religious Freedom Restoration Act is unconstitutional and ruled that Congress did not overstep its constitutional bounds in passing the act. The parties now debate the proper interpretation and application of the act. Plaintiffs contend that the challenged regulations substantially burden their exercise of religion by preventing them from wearing crosses and possessing religious works beyond the twenty-five publication limit. Defendants argue that plaintiffs cannot meet the act's initial requirement of showing a substantial burden on their exercise of religion because plaintiffs cannot prove that their respective religions mandate the proscribed practices at issue. Plaintiffs contend that the act does not necessitate

proof that their religious practices are mandated but requires only that the substantial burden fall on a practice that is sincere and religiously motivated. I conclude that the Religious Freedom Restoration Act calls for a religiously motivated standard but find that plaintiffs have met their burden on this point only with respect to the jewelry prohibition.

Defendants argue that they implemented the jewelry restriction to further the compelling state interests of prison safety, order and discipline and that the complete prohibition is the least restrictive means of achieving those goals. Plaintiffs contend that defendants' proffered aims are not compelling, that even if they are compelling, the regulation is not rationally related to furthering those goals and that the regulation is not the least restrictive means of achieving defendants' stated goals. I conclude that although defendants' stated goals are compelling, they have not chosen the least restrictive means of achieving them with respect to the jewelry regulation. I further conclude that plaintiffs' other claims do not afford them grounds for any additional relief. Accordingly, I will grant summary judgment for plaintiffs on the jewelry restriction and summary judgment for defendants on the publication limitation.

From the parties' proposed findings of fact, I find the following facts to be undisputed.

## UNDISPUTED FACTS

Plaintiff Sylvester Sasnett is a prisoner at Columbia Correctional Institution in Portage, Wisconsin; plaintiff Lonnie Smith is incarcerated at Fox Lake Correctional Institution in Fox Lake, Wisconsin; plaintiffs James Lowery and James Hadley are imprisoned at Waupun Correctional Institution in Waupun, Wisconsin. Plaintiff Barbara Miller has been an inmate at Taycheedah Correctional Institution in Fond du Lac, Wisconsin, from July 19, 1985 until present, except for the period between January 13, 1994 and January 19, 1995, when she was incarcerated at the Outagamie County jail in Appleton, Wisconsin. Plaintiffs are subject to the laws, rules, regulations and informal policies and procedures of the state of Wisconsin and its Department of Corrections. If plaintiffs violate these proscriptions, they are subject to discipline.

Defendant Michael Sullivan is Secretary of the Department of Corrections. Defendant Ken Sondalle is Administrator of the Division of Adult Institutions of the Department of Corrections. Defendants Jeffrey Endicott, Gary McCaughtry, Gerald Berge, and Kristine Krenke are the wardens of Columbia Correctional Institution, Waupun Correctional Institution, Fox Lake Correctional Institution, and Taycheedah Correctional Institution, respectively. All defendants are responsible for enforcing the rules, regulations, practices and procedures of the Department of Corrections and are sued in their official capacities.

The Department of Corrections and the individual correctional institutions regulate and restrict the possession and acquisition of inmates' personal property in several ways, including administrative rules promulgated pursuant to chapter 227 of the Wisconsin Statutes and published in the Wisconsin Administrative Code; emergency rules; internal management procedures, which are not promulgated according to statute and are not legislative rules of conduct; and institution handbooks provided to prisoners containing various rules, internal management procedures, policies and procedures.

In March 1988, a fire marshal from the Portage Fire Department conducted a fire inspection of Columbia Correctional Institution and recommended for fire protection that legal papers and storage in cells should be limited to a single $21'' \times 21'' \times 21''$ box. Columbia Correctional Institution adopted this recommendation in September 1988. Fire prevention aims to minimize the development and spread of a fire and is of particular importance to the safety of individuals, such as inmates, who cannot get away from a fire on their own. Fires spread faster when large amounts of paper are strewn about an area rather than stored in a container.

In January 1990, Sheldon Schall, Chief of Fire Protection for the Department of Industry, Labor and Human Relations, conducted a comprehensive fire inspection of Waupun Correctional Institution, looking at the accumulation of combustible material in cells.

During the inspection, Schall observed a significant number of cells presenting a great fire potential because of the amount of paper stored in the cell or the manner in which the paper was stored. Many cells contained bags or boxes of documents and magazines. Schall was concerned that the bags and boxes of paper throughout the cell would pose an obstacle to the prison staff's mobility when entering a cell for emergency purposes. In addition, he was concerned that the accumulation of paper in the cells would have a negative effect on the air exchange system, causing a build-up of smoke and toxic gases in the event of a fire. Schall recommended that to diminish the potential for a fire, allow for ease of mobility in a cell during an emergency and provide for proper air exchange, paper should be limited to an amount that could be stored in a 21″ × 21″ × 21″ container. Schall recommended a container of that size because it could fit under a bunk while still providing reasonable room to store paper.

On or about May 13, 1991, defendant Gerald Berge, then Administrator of the Division of Adult Institutions, Department of Corrections, sent a memo to all wardens concerning inmates' possession of personal property and asked the wardens to respond to the issue of allowable property, including whether it was necessary to examine additional limits on that property. All wardens agreed that inmate property should be reviewed and limited in light of an increased inmate population, double celling and frequent inmate transfers.

On or about July 29, 1991, defendant Sondalle appointed an inmate property work group to review the wardens' responses and the department's inmate property procedures and to make specific recommendations to Sondalle's office regarding the limiting and handling of inmate personal property by October 1, 1991. The work group discussed the overcrowding in the Wisconsin prison system that had led to double celling and its associated problems of excessive property in a cell designed for one individual. In addition, the work group analyzed the wardens' responses and ultimately reported to defendant Sondalle that personal property should be limited and some property eliminated: 1) to reduce the fire hazards associated with property in cells; 2) to protect the department from liability for losses resulting from the high volume of inmates being moved through the system; 3) to reduce the frequency of, and temptation for, inmate theft; 4) to reduce the use of property as a bartering commodity and as payoffs in gambling; 5) to reduce the amount of staff resources needed to process incoming and outgoing property, inventorying property, packing, shipping and tracking inmate property; 6) to reduce the sheer volume of property because of limited floor space in cells, especially considering the overcrowded conditions; 7) to reduce property because a high volume of property makes hiding contraband easier and significantly slows the process of searching cells and; 8) to reduce property because a high volume of property leads to fights and strong arming. The inmate property work group recommended that the maximum amount of inmate property fit inside three containers for transporting purposes, specifying dimensions of 32″ × 15″ × 14″ for personal property, 20″ × 20″ × 20″ for hobby materials and 20″ × 20″ × 20″ for legal materials.

The inmate property work group also discussed the issue of inmates wearing jewelry and noted that jewelry, i.e. rings, earrings, pins, crosses, crucifixes and medallions are worn by gang members to show particular gang affiliations. The committee believed that there was no way to distinguish readily between jewelry worn as a symbol of religious belief and jewelry worn to signify gang affiliation. To avoid discriminating against any particular religion that used as a symbol of its faith a symbol similar or identical to a symbol used as a gang identification, the work group recommended disallowance of all jewelry. Although three-inch crucifixes had been allowed under the then-existing policies, the work group advised eliminating them as allowed property because their wearing was not known to be required by any religious faith.

The work group recommended eliminating as allowable property all jewelry except one watch, a personal wedding band and a medical alert medallion because jewelry was a potentially expensive item that could be used

in bartering and strong arming and could be claimed as lost or stolen when such was not the case and the majority of allowed jewelry served no constructive purpose. Also, the committee advocated the discontinuance of color combinations in inmate clothing because gang members wear certain colors of clothing to show their gang affiliation.

The work group considered the difficulty of defining different categories of publications so that they could be readily distinguished from one another. The group recommended limiting inmates to the possession of twenty-five publications of any type including legal, religious and educational materials, but not including publications checked out from the institution libraries. In addition, the work group considered the possession of legal materials, including personal writings and miscellaneous documents maintained in inmate cells in light of the fire marshals' recommendations and other problems associated with paper. The group recommended that each inmate be allowed to retain legal materials necessary for active legal actions, with the legal materials fitting into one box upon transfer, and that additional storage space for legal material be available on a temporary basis to inmates who demonstrated a need for additional material in connection with on-going litigation. The inmate property work group took into consideration the types and amounts of property it believed would provide inmates with the basic necessities while at the same time addressing the problems of excessive inmate property. The recommendations of the work group were given to the institution wardens for review and comment and then forwarded to Terri Landwehr, Administrator of the Division of Adult Institutions of the Department of Corrections, for approval. Landwehr and defendants Sondalle, McCaughtry, Endicott and Berge agreed with the findings of the work group.

The Department of Corrections affords inmates an opportunity to raise grievances that are investigated and decided through the inmate complaint review system. The number of inmate complaints has increased steadily with the increasing inmate population. For the years 1982 through 1994, property ranked first in volume of complaints received, averaging 25.43% of the complaints per year. When inmate personal property is lost or damaged by staff action or inaction, the Department of Corrections compensates the inmate.

The Dodge Correctional Institution's central transportation unit transports most of the inmates of the male adult correctional institutions among the various institutions. Occasionally, institutions transport their own inmates. Before the implementation of the internal management procedures concerning personal property and clothing, separate trips were often required to pick up and transfer the property of inmates that did not fit in the transport van or bus. Since the implementation of the procedures, it is unusual to make more than one trip to transport the inmates and their property.

An excessive amount of publications in an inmate's cell not only presents a fire hazard but also substantially increases the hiding places for contraband and the time it takes an officer to search the cell. With double celling, there is twice the amount of property to be searched. The most time-consuming aspect of a cell search is the searching of paper such as letters, legal materials, books, magazines and newspapers but it is necessary for the security of staff, inmates, and the public. Officers have found razor blades and drugs in such papers as well as motor vehicle registration stickers stolen by an inmate from his institution's production factory and intended to be sent to his family for illegal sale "on the street." The implementation of the new property rules has cut in half the time required to search a cell and has enhanced the safety of the institutions by making it easier to locate and seize any contraband.

The Columbia Correctional Institution, a maximum security institution opened in May 1986, began double celling on January 30, 1991. Waupun Correctional Institution began double celling on March 5, 1987.

On May 1, 1992, the Department of Corrections, Division of Adult Institutions, issued a memorandum to all wardens and superintendents entitled "Revised Internal Management Procedures Relating to Inmate

Personal Property and Clothing," containing revised inmate personal property and clothing procedures that became effective on June 1, 1992, although inmates incarcerated on that date were given until June 1, 1993, to come into compliance. Under Internal Management Procedure DOC 309 IMP # 1–D, inmates are forbidden to wear earrings, necklaces, bracelets, ankle bracelets and pins, including religious jewelry such as crucifixes. Internal Management Procedure DOC 309 IMP # 4 prohibits inmates from possessing more than twenty-five books, magazines, newspapers or periodicals, including religious publications, and requires that inmates purchase all reading materials through approved retail outlets or publishers. Inmates cannot receive publications that do not come from a publisher or other commercial source. Wis.Admin.Code § DOC 309.06(2)(a).

On June 1, 1994, new permanent property rules went into effect. One of the rules, Wis.Admin.Code § DOC 309.35(3), directs prison wardens to develop policies and procedures relating to the acquisition, possession and use of personal property by inmates, to make a list of personal property items permitted at their institutions and to determine the permissible methods by which personal property may be acquired. Subsection (3)(d) forbids inmates to possess more personal property than can fit into a receptacle 32″ × 16″ × 16″, or 8192 cubic inches, excluding medically prescribed items, hobby materials, legal materials, electronic equipment, typewriters, fans or other "large items." Subsection (3)(e) requires that an inmate's hobby materials fit into a receptacle 14″ × 14″ × 14″, or 2744 cubic inches, excluding one oversized item. Subsection (3)(f) requires that an inmate's legal materials fit into a receptacle no larger than 20″ × 20″ × 20″, or 8000 cubic inches, and allows wardens to authorize additional storage space on a temporary basis "upon a demonstrated need in connection with on-going litigation and consistent with fire codes and regulations." Wis.Admin.Code § DOC 303.47 provides for the discipline of inmates who possess contraband and defines contraband as any items not included on "the posted list" of permissible inmate possessions, items not listed on the

inmate's property list and items not belonging to the inmate.

Inmates in the general population and some segregation units of the Wisconsin prison system are allowed to have matches, tobacco and cigarettes in their cells.

Because of the new property restrictions, plaintiff Sasnett was required to relinquish approximately eleven religious books, including *The Amplified Bible,* volumes 1 through 3 of the *Jamison, Fauset Brown Commentary,* the *Inductive Study Bible,* the *NIV Interliner Greek–English New Testament* and the *NIV Interliner Hebrew–English Old Testament.* These books aided Sasnett in his desire to study religion and become a minister. Sasnett sent the books out of prison to or with his pastor. The Columbia Correctional Institution offered Sasnett the opportunity to donate his books to the chapel library but he chose not to do so. Sasnett also gave up a gold crucifix.

Sasnett is presently employed in the chapel at the Columbia Correctional Institution. The chapel contains two crosses. Religious property used in group services, such as a crucifix, is available for religious services in the chapel and other appropriate areas of the Columbia Correctional Institution.

Sasnett belongs to the Truth Bible Church, a nondenominational Christian church. The Truth Bible Church believes in the word of God as being the sole counsel and the sole means and direction by which people should live. Sasnett knows of only one Truth Bible Church in the country, located in Waukesha, Wisconsin. The Truth Bible Church has no specific texts or teachings unique to that church alone, other than the Holy Bible.

Before 1992, prison regulations permitted plaintiff Sasnett to wear a crucifix around his neck, but he did not. Sasnett received a crucifix in 1992 and after that time wore it at all times as a constant reminder of his faith. Sasnett's crucifix is about two inches long and consists of a simple yellow gold cross with a white gold body of Christ affixed to the cross. Sasnett wore the crucifix inside his shirt attached to a gold chain, measuring approximately eighteen inches. No one has ever attempted to steal Sasnett's crucifix or a

watch that he wears that is worth approximately $32.00.

In addition to wearing a crucifix around his neck, plaintiff Sasnett practices his religion by attending services regularly, praying in his cell, frequently reading his Bible and other religious books and consulting with his minister. Wearing a crucifix is not a requirement of plaintiff's religion. If Sasnett were forced to stop attending services, praying, studying the Bible and other religious books, and kept from consulting with his pastor, he would still consider himself a Christian and strive to live a Christian life. Sasnett does not have an image of Christ hanging on the cross in his cell.

Plaintiff Sasnett is aware that jewelry is often stolen in prison and has heard of gang members wearing distinctive pieces of clothing or other objects to indicate their gang affiliation. He has never been a gang member or worn a cross to signify gang membership.

Plaintiff Lonnie Smith is a Christian inmate at Fox Lake Correctional Institution who does not identify with a specific religious organization. He wore two crosses around his neck at all times from the time he received them as gifts to the time he was forced to surrender them pursuant to Department of Corrections property rules. One of Smith's crosses is approximately one and a half inches long; the other is slightly smaller, and both are made of yellow gold. The larger cross, worth approximately $75, is textured with tiny punched holes and the smaller cross, worth approximately $65, has carved lines on its surface. Except for the subtle texturizing visible only from close range, neither of Smith's crosses has any "stylizing" or extra parts. Each of the crosses came affixed to gold chains, one of approximately eighteen to twenty inches in length and the other about fourteen to sixteen inches long. The chains are probably worth several hundred dollars but plaintiff Smith would wear his crucifix attached to a string if allowed. Smith had his crosses blessed and wore them on the outside of his clothing to demonstrate his faith. Smith's crosses helped him to get to know God better and to deal with people better.

No one has ever attempted to steal Smith's crucifixes or his watch, which is worth approximately $75.00. Smith has never been a member of a gang, does not associate with gang members and does not know of anyone who uses crosses as gang insignia. Smith participates in church activities at Fox Lake Correctional Institution, including bible study, singing, songwriting and playing in a band. He also practices his religion by attending services regularly, praying in his cell, reading his Bible frequently, and urging others to lead a Christian life. If Smith were forced to stop practicing his religion in these ways, he would still consider himself a Christian and strive to live a Christian life.

Fox Lake Correctional Institution has a cross displayed in an encasement in the front of the chapel. The doors to the encasement are closed for non-Christian services. A crucifix is made available for Catholic services. Plaintiff Smith believes the cross represents everybody that comes to the chapel and that the cross that he wore around his neck represented him when he was not at church. Smith believes that he cannot be a Christian without wearing the cross because it helps him understand God and deal with people better. People knew Smith was a Christian before he received his crosses because he represented himself as a Christian. Plaintiff Smith spends as much time in the chapel as he can and seeks guidance from the Fox Lake chaplain.

Plaintiff Barbara Miller is a Lutheran incarcerated at Taycheedah Correctional Institution. She wore a cross around her neck at all times, except when bathing, from the time she received it until she was forced to surrender it pursuant to the Department of Corrections property rules. Miller's cross is about two inches long, consists of a plain yellow gold cross with a diamond chip in the middle, has no "stylizing" or extra parts, was attached to a gold chain approximately sixteen to eighteen inches long, and cost $32.00 when purchased. Miller feels closer to God when she wears her cross. Reading the Bible has helped Miller some in compensating for the loss of the cross. Miller used her cross as an aid to prayer by holding it in her hand while she prayed.

Miller filed an inmate complaint pursuant to the inmate complaint review system to challenge the prohibition against wearing crosses. Her complaint was dismissed at both the institutional and appellate levels. Miller was informed that the prohibition was designed to prevent the wearing of gang-related jewelry.

Miller wears a watch worth approximately $75.00. No one has ever tried to steal either her cross or her watch. Miller has never been a member of a gang. In addition to wearing a cross around her neck, Miller practices her religion by praying in her cell, reading her Bible frequently, and consulting with her minister. If forced to stop these practices, Miller would still consider herself a Christian.

Plaintiff Miller does not attend Lutheran services at Taycheedah Correctional Institution because she thinks there is too much commotion with people "screaming and singing outrageously." Instead, Miller listens to religious tapes and reads the Bible in her cell. Plaintiff has a picture of Jesus Christ in her cell and believes that the images of Christ and the cross both signify belief in Christ. Miller believes a cross is not essential to being a Lutheran and does not act or relate to others any differently now that she is not permitted to wear the cross. She continues to be a Christian without her cross.

Plaintiff James Lowery claims to suffer from a multiple personality disorder. At least one of Lowery's alleged personalities, "Lee," is a strict Catholic. In order to comply with the rules limiting the allowable number of publications to twenty-five, plaintiff Lowery relinquished bible study material and booklets and several religious books although he did not make a list of these books and does not remember their titles. Lowery felt compelled to part with these items because he wanted to retain as many "how-to" books on writing and filing legal documents as possible. Lowery's allotment of twenty-five publications consists entirely of legal materials except for one King James Bible. Lowery is segregated from the general population at Waupun Correctional Institution and does not have direct physical access to the chapel library but can request and receive religious publications from that library.

Plaintiff James Hadley does not belong to any organized religion but believes in God and is interested in learning more about religion, especially the Jehovah's Witness religion. Hadley never attended Jehovah's Witness services prior to his incarceration. Hadley's sister, who is a Jehovah's Witness, sent him the Jehovah's Witness pamphlets Watch Tower and Awake and he studied and discussed those with her. Prison guards confiscated these pamphlets during a "shakedown" of Hadley's cell. After Hadley was informed that he had to send his pamphlets out of the prison because of the twenty-five publication limit, he sent them home with his sister. Hadley kept a Mormon Bible and the Bibles of several other denominations, as well as a visitor guide, western era books, and Ebony and Outdoor Life magazines. Hadley believes that it was helpful to him to study and discuss the Jehovah's Witness literature with his sister, a member of that faith. In addition to studying the Jehovah's Witness materials and discussing them with his sister, Hadley seeks religious guidance by praying, reading his Bible and sometimes going to the prison chapel. If Hadley were prevented from praying and reading his Bible, he would still try to lead a righteous life and to seek understanding of God.

Services for Jehovah's Witnesses are held each Wednesday at Waupun Correctional Institution, at which time the pamphlets Watch Tower and Awake are brought in by the Jehovah's Witnesses representative upon request. These pamphlets may be obtained for an inmate's personal possession. Hadley is unaware that Jehovah's Witness pamphlets are available in the chapel and has not asked anyone whether he can obtain access to them in the prison. A crucifix is displayed in the chapel for Catholic services at Waupun Correctional Institution, where both plaintiffs Lowery and Hadley are incarcerated.

Religious ornamentation has been the focus of interest across traditions and cultures throughout history. Ornamentation such as jewelry may be used as a symbol of status within a religious community, to ward off evil, to invite beneficial assistance, to protect

health, to worship, to define the wearer's place in a religious world view, to obey religious laws, to mark stages in religious advancement and to indicate membership in a religious group or express religious identity in many other ways. Crosses and crucifixes are examples of religious jewelry. The use and importance of religious jewelry vary among religious traditions and among different practitioners within the same religious tradition. Christianity, and the plaintiff's versions of Christianity, do not mandate the wearing of a cross or crucifix.

Religious texts are used for prayer, liturgy, ritual, spiritual direction, healing, communication with the divine, reflection on the meaning of human existence and part of adherence to a religious community. Personal ownership and study of religious commentaries other than the Bible is not required by the plaintiffs' religions.

Religious practice confers many benefits to prisoners. Religious practice and faith can introduce an element of morality into inmates' thinking that leads them to behave lawfully. Religious practice and faith can give prisoners a great degree of personal satisfaction. Inmates who are involved in church activities and who are behaving in ways consistent with religion usually act in ways that are consistent with penological goals.

Inmates at Columbia Correctional Institution may borrow up to three religious books through the chapel library for a period of two weeks and from the regular prison library for a period of three weeks and may renew the books if necessary. There are approximately 700 books in the chapel library. Inmates at Waupun Correctional Institution may borrow eight books, including religious publications, from the prison library for a period of four weeks with the option to renew the books for another four weeks. Inmates at Fox Lake Correctional Institution may borrow six religious publications and four religious cassettes through the chapel library for three weeks with the option to renew if no one else is waiting to borrow the item. Inmates at Taycheedah Correctional Institution may borrow up to five religious books and pamphlets through the chapel library for

approximately one month and may check out four books from the library for a period of two weeks with a renewal option. Publications not available at these institutions may be obtained through inter-library loan. Religious publications borrowed from these libraries are excluded from the number of publications allowed in a cell.

The size of cells varies from prison to prison and even within the same prison.

## OPINION

### A. Religious Freedom Restoration Act

In an earlier opinion in this case, I explained the circumstances leading to Congress's passage of the Religious Freedom Restoration Act. *See Sasnett,* 891 F.Supp. at 1314. To reiterate briefly, in *Employment Division, Department of Human Resources v. Smith,* 494 U.S. 872, 878, 110 S.Ct. 1595, 1599–1600, 108 L.Ed.2d 876 (1990), the United States Supreme Court held that generally applicable, religion-neutral laws that incidentally burden the free exercise of religion need not be justified by a compelling state interest. Congress viewed the Court's decision as virtually eliminating "the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion," and responded with the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb, attempting to restore the prior law, which it viewed as more protective of religions. *Sasnett,* 891 F.Supp. at 1314 (citing 42 U.S.C. § 2000bb(a)(4)). In subsection (b) of § 2000bb–1, Congress provided that:

> (b) EXCEPTION.—Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

Plaintiffs' Religious Freedom Restoration Act claim can be analyzed in two parts: first, by determining whether plaintiffs' exercise of religion is substantially burdened by defendants' property regulations

and then by determining whether defendants employ the least restrictive means possible to achieve the compelling state interests the regulations seek to promote.

■ Before beginning the analysis, it is necessary to note that the act applies to prisoners' free exercise claims. *See Werner v. McCotter,* 49 F.3d 1476, 1479 (10th Cir. 1995), *cert. denied,* —— U.S. ——, 115 S.Ct. 2625, 132 L.Ed.2d 866 (1995); *Bryant v. Gomez,* 46 F.3d 948 (9th Cir.1995) (per curiam); *see also* S.Rep. 111, 103d Cong., 1st Sess. (1993), *reprinted in* 1993 U.S.C.C.A.N. 1892, 1898–1901 (act establishes one standard for testing claims of government infringement on religious practices). The Senate explicitly rejected an amendment to prohibit the act's application to prisoners. 139 Cong.Rec. S14,453 (daily ed. Oct. 27, 1993) (58–41 vote).

### 1. *Substantial burden on exercise of religion*

The initial and difficult question is deciding what constitutes a "substantial burden" on a person's exercise of religion. Defendants contend that the challenged regulations do not impose a substantial burden on plaintiffs' exercise of religion because neither wearing a cross nor maintaining possession of more than twenty-five religious books is mandated by any of the plaintiffs' respective religions. Defendants argue that the jewelry prohibition is not a substantial burden because plaintiffs can continue to adhere to their respective faiths without wearing a crucifix and the book limit does not force any plaintiff to give up his Bible, the only book required by any of the plaintiffs' religions.

Plaintiffs argue that the Religious Freedom Restoration Act does not compel them to show that the actions forbidden by the challenged regulations are "required" by their religions but necessitates only a showing that the prohibited practices are "motivated" by a sincere religious belief. Plaintiffs maintain that the Religious Freedom Restoration Act protects a person's own individualized beliefs and that a practice does not have to be in accordance with standardized or objective religious principles to receive protection.

To date, only two United States courts of appeals have issued opinions on interpreting the Religious Freedom Restorations Act's substantial burden test. *Werner v. McCotter,* 49 F.3d 1476; *Bryant v. Gomez,* 46 F.3d 948. In *Bryant,* the Court of Appeals for the Ninth Circuit held that

the religious adherent ... has the obligation to prove that a governmental [action] burdens the adherent's practice of his or her religion ... by preventing him or her from engaging in conduct or having a religious experience which the faith *mandates*. This interference must be more than an inconvenience; the burden must be substantial and an interference with a tenet or belief that is *central to religious doctrine*.

46 F.3d at 949 (internal citations omitted) (emphasis added). In *Bryant,* the plaintiff sought relief requiring defendants to provide full Pentecostal services at the prison where he was incarcerated, arguing that defendants' refusal to hold full Pentecostal services precluded him from participating in the practices and using the "traditional instruments" specific to his faith. The court rejected plaintiff's claim because he presented no evidence that the practices employed during the service were mandated by the Pentecostal faith. *Id.*

In *Werner v. McCotter,* the Court of Appeals for the Tenth Circuit held:

To exceed the "substantial burden" threshold, government regulation must significantly inhibit or constrain conduct or expression that manifests some central tenet to a prisoner's individual beliefs; must meaningfully curtail a prisoner's ability to express adherence to his or her faith; or must deny a prisoner reasonable opportunities to engage in those activities that are fundamental to a prisoner's religion.

49 F.3d at 1480 (citations omitted). In *Werner,* the plaintiff, a state prison inmate and practitioner of Native American shamanism, alleged that defendants had interfered unconstitutionally with the free exercise of his religion by denying him access to a sweat lodge, a medicine bag, various other religious symbols and a spiritual advisor or religious literature appropriate to his beliefs. *Id.* at

1478–79. In remanding plaintiff's claim for further evidentiary findings, the court noted that a prohibition against the possession of religious symbols for those faiths for whom the symbols have sufficient importance could qualify as a substantial burden under the Religious Freedom Restoration Act. *Id.* at 1481. Although in *Werner* the court incorporated *Bryant*'s religious centrality element as part of its substantial burden test, it listed other factors for consideration that considerably broadened the scope of its substantial burden inquiry. Unlike the Court of Appeals for the Ninth Circuit in *Bryant,* the Tenth Circuit recognized the possibility that an individual's free exercise of religion could be substantially burdened even if the burdened practice were not one mandated by that individual's religion. Although the court did not choose specifically between a religiously mandated and religiously motivated test, it did emphasize the role of individual adherence to a particular faith.

In *Werner,* the court did not have to decide whether the Religious Freedom Restoration Act requires courts to apply a *Bryant*-like religiously mandated test or a religiously motivated inquiry. Unlike the *Werner* court, I must choose between these two significantly different tests. Because the parties agree that none of the plaintiffs' faiths mandate the wearing of crosses or the possession of religious publications above the limit of twenty-five, application of a religiously mandated test means that plaintiffs' case would fail.

A number of district courts have applied a religiously mandated test like the one articulated in *Bryant. Muhammad v. City of New York Department of Corrections,* 904 F.Supp. 161, 191–92 (S.D.N.Y.1995); *Daytona Rescue Mission v. City of Daytona Beach,* 885 F.Supp. 1554, 1559–60 (M.D.Fla.1995) (adopting *Bryant* test); *Weir v. Nix,* 890 F.Supp. 769, 788 (S.D.Iowa 1995) (no substantial burden because prohibited practice not mandated by plaintiff's faith); *Davidson v. Davis,* 1995 WL 60732 at *5 (S.D.N.Y. Feb. 14, 1995). Numerous other courts have hedged, either finding or not finding a substantial burden without choosing between the tests. *See Hall v. Griego,* 896 F.Supp. 1043, 1047 (D.Colo.1995) (applying *Werner* without distinguishing between mandated and motivated

part of test); *Rust v. Clarke,* 883 F.Supp. 1293, 1306–07 (D.Neb.1995) (finding substantial burden on plaintiffs' exercise of Astrau religion); *Alameen v. Coughlin,* 892 F.Supp. 440, 448 (E.D.N.Y.1995) (interference substantially burdened a belief "central" to plaintiff's religion); *Hamilton v. Schriro,* 863 F.Supp. 1019, 1022 (W.D.Mo.1994) (finding substantial burden because forbidden practices were "essential component" of Native American religion). Only one court of which I am aware has determined specifically that the religiously motivated test is the proper interpretation of Congressional intent on the issue. *See Muslim v. Frame,* 897 F.Supp. 215 (E.D.Pa.1995); *see also Campos v. Coughlin,* 854 F.Supp. 194, 209–10 n. 13 (S.D.N.Y.1994) (adopting a similar test focusing on sincerity of individual religious beliefs but in less explicit terms).

The language of the Religious Freedom Restoration Act does not indicate clearly whether Congress intended to apply a religiously mandated or a religiously motivated test but the legislative history makes evident that Congress was aware of the distinction. The difference played a role in debates concerning the application of the act to a woman's decision to seek an abortion, an issue especially pertinent at the time because *Planned Parenthood v. Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), was pending before the Supreme Court and it was uncertain whether the Court would overturn *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). Douglas Laycock & Oliver S. Thomas, *Interpreting the Religious Freedom Restoration Act,* 73 Tex.L.Rev. 209, 231 (1994). Pro-life supporters feared the bill would allow women to assert that their abortion decisions were motivated by religious beliefs. The following colloquy between Representative Stephen Solarz, the original sponsor of the act, and Representative Henry J. Hyde, leader of the anti-abortion opponents to the bill, illustrates the debate.

*Rep. Hyde:* Well, does your bill, H.R. 2097, protect conduct compelled by religious belief, or conduct motivated by religious belief?

*Rep. Solarz:* I think that fine distinction is something that I would prefer to leave to the courts.

*Rep. Hyde:* We are drawing a statute now, and legislative intent is very important. As the chief sponsor, your views on this are critical; and therefore I would like to know your view rather than just pass the ball to the court....

Does H.R. 2797 protect conduct compelled by religious belief or conduct motivated by religious belief? You see the difference....

*Rep. Solarz:* .... I would be reluctant to limit it to actions compelled by religion as distinguished from actions which are motivated by a sincere belief. However ...

*Rep. Hyde:* Now we are getting to it. All of this stuff about being compelled is really beside the point. It is, someone who says my religion nudges me toward—I think it is compatible with my religion to have an abortion. That is motivated. And that is protected by your bill.

*Rep. Solarz:* No, it isn't.

*Religious Freedom Restoration Act of 1991: Hearings on H.R. 2797 Before the Subcomm. on Civil and Constitutional Rights of the House Comm. on the Judiciary,* 102d Cong., 2d Sess. 1 (1992) (hereinafter *Hearings on H.R. 2797*). Representative Solarz recognized that this colloquy did not resolve the issue and later clarified his views in a letter to subcommittee chairman Don Edwards that was included in the record of the act. Solarz indicated that he believed the drafters envisioned a religiously motivated test:

Were Congress to go beyond the phrasing chosen by the drafters of the First Amendment by specifically confining the scope of this legislation to those practices compelled or proscribed by a sincerely held religious belief in all circumstances, we would run the risk of excluding practices which are generally believed to be exercises worthy of protection.

*Hearings on H.R. 2797* at 128–30. Representative Solarz also quoted a letter written by professors Michael McConnell, Douglas Laycock and Edward McGlynn Gaffney in support of this position:

It is difficult to capture the idea of the dictates of conscience in statutory language because different theological traditions conceptualize the force of [God's] moral order in different ways. Some treat it as a binding moral law; others view it as an expression of [God's] will, which believers freely conform to out of love and devotion to [God].... it would be a mistake to tighten the language of the Act by confining it to conduct "compelled by religious belief."

*Id.* at 129; *see also Muslim,* 897 F.Supp. at 218–219. This aspect of the debate became muted after the Supreme Court issued its opinion in *Casey* and it does not appear that Congress returned to it again after the *Casey* decision.

Although Representative Solarz's statements are supportive of a religiously motivated test, his views are not fully indicative of Congressional intent on the point. Congress instructed courts to look to pre-*Employment Division, Department of Human Resources v. Smith* case law for direction in interpreting free exercise claims under the act. *See Goodall v. Stafford County School Board,* 60 F.3d 168 (4th Cir.1995) ("[s]ince RFRA does not purport to create a new substantial burden test, we may look to pre-RFRA cases in order to assess the burden on the plaintiffs for their RFRA claim"). *Muslim v. Frame,* 897 F.Supp. 215, is particularly persuasive on this question and seems to be the first judicial analysis of the relation of pre-*Smith* cases to this issue. *Muslim* involved a Muslim inmate's challenge to an institutional regulation that effectively prohibited him from wearing his prayer cap in the common areas of the prison. Examining the substantial burden question, the court found that although some cases characterized the religious practice as religiously mandated, others described it in terms of sincerely held beliefs, without offering any reasons for the distinction. *Id.* at 219–20 (citing cases).

Defendants acknowledge that there has been no consistent, established articulation of the substantial burden test but argue that the Supreme Court has always held that the religious belief or practice at issue must be more than just sincerely held. *See Wiscon-*

*sin v. Yoder*, 406 U.S. 205, 218, 92 S.Ct. 1526, 1534–35, 32 L.Ed.2d 15 (1972) (compulsory high school attendance law a threat to "essential part of [Amish's] religious belief and practice"). Defendants also contend that plaintiffs misconstrue "substantial burden" when they use it as a synonym for religious belief, citing *Thomas v. Review Bd. of Indiana Employment Sec.*, 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981), and *Hobbie v. Unemployment Appeals Comm'n of Florida*, 480 U.S. 136, 107 S.Ct. 1046, 94 L.Ed.2d 190 (1987). I do not read these cases as limiting free exercise inquiry to religiously compelled practices. Even *Yoder* does not fully support a religiously compelled test. *See* Ira C. Lupu, *Of Time and the RFRA: A Lawyer's Guide to the Religious Freedom Restoration Act*, 56 Mont.L.Rev. 171, 203 (1995) (Amish faith did not mandate withdrawal of teenage children from school). Also, I do not understand plaintiffs to be arguing that they merely need to hold a religious belief to meet their threshold burden of proof. To the extent that any pre-*Smith* cases employ a burden requirement blocking all non-compelled practices, Congress's remedial intent in passing the Religious Freedom Restoration Act argues against that approach. *Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967) (remedial statute should be construed broadly to effectuate its purposes).

Justice O'Connor's concurrence in *Smith* suggests that pre-*Smith* case law recognized a religiously motivated test and is cited approvingly in the Senate Judiciary Committee report accompanying the act. *See Smith*, 494 U.S. at 891–907, 110 S.Ct. at 1606–15 (O'Connor concurring); Senate Comm. on the Judiciary, Religious Freedom Restoration Act of 1993, S.Rep. No. 111, 103d Cong., 1st Sess. 10 (1993), *reprinted in* 1993 U.S.C.C.A.N. 1892, 1899, 1900 [hereinafter Senate report]. Justice O'Connor wrote:

> Because the First Amendment does not distinguish between religious belief and religious conduct, conduct motivated by sin-cere religious belief, like the belief itself, must therefore be at least presumptively protected by the Free Exercise Clause. A person who is barred from engaging in religiously motivated conduct is barred from freely exercising his religion.

*Smith*, 494 U.S. at 893, 110 S.Ct. at 1608. Justice O'Connor does not cite any Supreme Court precedent in making these statements and thus does not fully articulate how cases before *Smith* analyzed the burden issue. Nonetheless, because the Senate Report makes clear its support for her position and because the language of the act tracks the test employed by Justice O'Connor, her opinion is relevant to Congressional intent. *See* Senate Report at 1896, 1899 n. 17.

Commentators on the Religious Freedom Restoration Act agree with the position that a religiously motivated standard should be the applicable test. *See* Lupu, 56 Mont. L.Rev. at 202; Laycock & Thomas, 73 Tex. L.Rev. at 232.[1] Lupu specifically rejects the "narrow" view that a person's exercise of religion is burdened only when there is a "direct legal prohibition against conduct religiously required," noting that Supreme Court precedent such as *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, a case defendants cite for this proposition, does not support a religiously mandated test. *Id.; see also* Douglas Laycock, *RFRA, Congress, and the Ratchet*, 56 Mont.L.Rev. 145, 151 (1995) ("The legislative history is clear that the conduct does not have to be compelled by religion").

The initial version of the Religious Freedom Restoration Act did not include the word "substantially" in its burden requirement. However, the addition of this word does not affect the applicability of the burden to religiously compelled or religiously motivated practices. Legislative history indicates that the inclusion of the word "substantially" was a "technical" amendment and a "clarification" that the act did not apply to governmental conduct that had an "incidental effect" on religious practices. 139 Cong.Rec.

---

1. Professor Lupu has considered burden issues before. He is the author of the first article analyzing the history of the Supreme Court's burden requirement in free exercise cases. *Where Rights Begin: The Problem of Burdens on the Free Exercise of Religion*, 102 Harv.L.Rev. 933 (1989).

S14532 (daily ed. Oct. 26, 1993) (statements of Senators Hatch and Kennedy). Senator Hatch explained that the amendment was intended to make the statutory test "consistent with the case law developed by the Court prior to *Smith*," so that only action placing a substantial burden on the exercise of religion would be subject to the compelling interest test. *Id.* The Senate report noted that the act would not require justification for every government action having an incidental effect on religious practices. S.Rep. 111, *reprinted in* 1993 U.S.C.C.A.N. at 1898.

Adopting a religiously motivated test has its pitfalls. Defendants contend that by adopting a religiously motivated test the courthouse doors would be flung open to RFRA claimants challenging all sorts of governmental action with minimal impact upon religious practice. Courts may have a more difficult time weeding out potentially frivolous claims and the government will be forced to justify its practices under the stringent compelling interest standard on a more regular basis. But such is the price Congress decided the government should pay in order to preserve the individual religious freedoms this country views as essential to liberty. Limiting free exercise inquiry to those practices mandated by certain religions places an unduly heavy burden on individuals attempting to assert their religious freedoms. As Representative Solarz noted, there may be important differences in the manner in which certain religions interpret divine guidance and moral persuasion. Certainly it is possible to envision a religion that furthers closeness to and understanding of the divine primarily through suggested rather than compelled practices. *See Rust,* 883 F.Supp. at 1306 n. 15 (Astrau religion teaches that source of holy wisdom is inside each individual and that sacred written sources contain examples of suggested conduct rather than commandments).

Recognizing the traps implicit in standards that involve subjective inquiries, I adopt the position of the court in *Muslim* and will apply a religiously motivated test.[2] Adoption of the religiously motivated test comports with the Supreme Court's guidance that the judiciary avoid becoming embroiled in questions of theology. *See Thomas,* 450 U.S. at 716, 101 S.Ct. at 1431 ("Courts are not arbiters of scriptural interpretation"); *Hernandez v. Commissioner,* 490 U.S. 680, 699, 109 S.Ct. 2136, 2148–49, 104 L.Ed.2d 766 (1989) (not within judicial ken to question the centrality of particular beliefs or practices to a faith or the validity of a particular litigants' interpretations of those creeds).

Thus, I find that plaintiffs' exercise of religion is substantially burdened if they can show that the burdened conduct or practice is 1) motivated by a sincerely held religious belief and 2) significantly or meaningfully curtailed. In the first step, the examination is whether the practice is a "person's exercise of religion." An individual must show that his belief is both sufficiently sincere and sufficiently religious. Proof of religiosity is especially important in the prison context because of the potential that prisoners might use religion as a pretext to achieve other goals. *See* Abbott Cooper, Comment, *Dam the RFRA at the Prison Gate: The Religious Freedom Restoration Act's Impact on Correctional Litigation,* 56 Mont.L.Rev. 325, 344 (1995). In the second step, the inquiry is objective, protecting the government from having to justify its regulations under a compelling interest standard if the burden on the asserted practice is incidental or *de minimis.* Such an objective inquiry is necessary to allow courts to distinguish between claims of minimal religious significance, such as throwing rice at church weddings and more consequential claims, such as the practice of getting married in church. *See Smith,* 494 U.S. at 887 n. 4, 110 S.Ct. at 1605 n. 4 (discussing necessity of a burden

**2.** The application of this test is at odds with this court's decision in *Escobar v. Landwehr,* 837 F.Supp. 284 (W.D.Wis.1993). In *Escobar,* I held that an inmate could not state a valid First Amendment claim that prison officials were violating his right to possess crucifixes because he could not demonstrate that possession of a crucifix was essential to the exercise of his religion. *Id.* at 288. Although *Escobar* may have continued relevance to First Amendment claims, the Religious Freedom Restoration Act rejects the basis of that holding for claims brought under its provisions.

inquiry so that government would not have to justify its compelling state interest in regulating such inconsequential religious activities as rice throwing). In *Thiry v. Carlson,* 887 F.Supp. 1407, 1414 (D.Kan.1995), *stay granted pending appeal,* 891 F.Supp. 563 (D.Kan. 1995), the court applied such an inquiry in determining that the condemnation of a parcel of land containing the gravesite of the plaintiffs' stillborn child did not work a substantial burden on plaintiff's free exercise of religion. Although I am not certain I would have reached the same outcome as the court in *Thiry,* the application of a substantiality test is necessary to protect the government from the rice throwing type of cases.

■ The matter at hand is not a rice throwing case. Defendants premise their contentions on the argument that because wearing a cross and reading religious books other than the Bible are not compelled by any of the plaintiffs' faiths, plaintiffs' free exercise of religion has not been substantially burdened. Also, defendants contend that plaintiffs can view crosses in their respective prison chapels and can pursue their faiths without wearing a cross. With respect to the publication limitation, defendants argue that the regulation does not substantially burden plaintiffs' religious practices because the only essential book in their faiths is the Bible and they were not forced to give up that book; plaintiffs could have donated their religious books to the prison chapel and would have had access to those books through the prison's check-out system; and plaintiffs undermined the sincerity of their claims by keeping non-religious books among their allotment of twenty-five publications. Plaintiffs assert that whether these practices are compelled is irrelevant; religious ornamentation has played an important role in many religions; the jewelry restriction affects their individual beliefs and ability to interact with God; and the presence of a cross in the prison chapel has no relevance to the exercise of religion outside the chapel. In addition, plaintiffs argue that the twenty-five publication limit operates as an infringement on the right to study religion; plaintiffs should not be forced to choose between maintaining religious books and legal books used to pursue their constitutional right of access

to the courts; the prison chapel's collection cannot adequately address the religious needs of each inmate; and donating their publications to the prison library is not an adequate alternative to maintaining individual possession of their books. Because the jewelry and publication regulations have affected the plaintiffs in different ways it is necessary to examine each of the regulations separately.

■ I have rejected defendants' primary argument, that the regulations do not impose a substantial burden on plaintiffs' exercise of religion because wearing crosses is not mandated by their faiths. Under a religiously motivated standard, religious requirements are irrelevant. Instead the focus is on the individual exercise of religion. *See Thomas,* 450 U.S. at 715–16, 101 S.Ct. at 1431 ("guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect"). The undisputed facts show that wearing a cross played an important role in the individual faiths of plaintiffs Sasnett, Smith and Miller. Plaintiffs wore their crosses at all times (except for plaintiff Miller who took her cross off when she bathed) because of sincere, religious beliefs that the crosses helped them to advance their faiths. Sasnett is a chapel employee who wants to become a minister; he wore his cross as a continuous reminder of his faith. Smith is a participant in prison bible study and a chapel band, who believes that the cross helps him to get to know God and deal with other people better. Miller feels closer to God when she wears her cross.

Defendants concede that plaintiffs hold these beliefs and that they are sufficiently religious but argue that the crosses to which plaintiffs have access in their respective prison chapels should satisfy their desire for that religious symbol. In making this argument, defendants misconstrue the nature of plaintiffs' claim. Occasional access to a communal cross hanging on a wall in the prison chapel is not the same as continual individual possession of an item used for personal and private devotion. *See Muslim,* 897 F.Supp. at 217 (government cannot limit particular exercises of religion by pointing to other

religious practices that remain available). It is similarly irrelevant that plaintiffs can maintain their faith in God without wearing the crosses and that plaintiffs did not wear crosses from the initial point prison regulations allowed such wearing.

The burden on plaintiffs' individual religious free exercise is substantial. Religious ornamentation and symbols have held great significance to members of a variety of religions, both historically and today. Courts have recognized the potential importance of medicine bags and hawk feathers to those practicing Native American shamanism, *see Werner*, 49 F.3d at 1481 (religious symbols play important role in expressing an individual's adherence to a particular faith); wearing prayer caps to Muslims, *see Muslim v. Frame*, 891 F.Supp. at 231; *Hall*, 896 F.Supp. at 1047; and wearing religious beads to adherents of the Santeria religion, *see Campos v. Coughlin*, 854 F.Supp. 194, 212 (S.D.N.Y.1994). The plaintiffs' crosses allow them to feel closer to and to better understand God. Preventing plaintiffs from keeping their crosses is not the type of minor or de minimis incursion with which Congress was concerned in passing the Religious Freedom Restoration Act. Failing to apply free exercise scrutiny to this practice would thwart the remedial purposes of the act. It is unlikely that if Congress were to pass a law effectively prohibiting all American citizens from wearing any type of religious ornamentation, the Supreme Court would refuse to apply free exercise inquiry on the ground that the law did not substantially burden religious freedoms. The same should hold true here. The fact that these plaintiffs are prison inmates has no bearing on the substantial burden inquiry, although it may be critical to the application of the compelling interest test.

Unlike the jewelry restriction, the publication limit does not impose a substantial burden on plaintiff Sasnett or on plaintiffs Lowery and Hadley. I acknowledge that plaintiff Sasnett gave up books that he used in his course of study to become a minister, that plaintiff Lowery relinquished bible study materials in order to maintain his collection of legal self-help manuals and that plaintiff Hadley sent out pamphlets that he was reading to further develop his religious understanding of the Jehovah's Witness faith. I do not question that these religious publications were of sincere importance to plaintiffs and that plaintiffs suffered when they relinquished them knowing that they could not be returned while plaintiffs were still in prison.

However, this is not the type of significant burden that Congress had in mind in passing the Religious Freedom Restoration Act. Plaintiffs were not forced to give up any specific books. Defendants set a limit and plaintiffs had the choice of which publications to retain within that limit. Plaintiffs could have kept all religious books and even could have donated the extra ones to their respective prison libraries with the possibility of checking them out at a later date. Plaintiffs did neither. They kept books on other subjects ranging from westerns to law books and gave their extra books to their ministers, relatives, and friends.

Plaintiffs contend that requiring them to relinquish any religious publications infringes on their right to study religion. Although the study of religion is important, I am unaware of any courts that have elevated it to a level of constitutional significance. The publication limitation may interfere to a certain extent with some inmates' abilities to engage in the study of religion but inmates can maintain up to twenty-five publications, a limitation that is rather generous.

Plaintiffs argue that they should not be required to give up other interests in order to pursue their religion and thus should be able to retain books on other subjects in addition to their religious books. Plaintiff Lowery emphasizes this argument, claiming that he chose to keep only legal self-help books in addition to a single Bible and that prisoners have an acute interest in maintaining legal aids to help them pursue their constitutional right of access to the courts. Although prisoners have a constitutional right of access to the courts for pursuing post-conviction remedies and for challenging the conditions of their confinement, *Campbell v. Miller*, 787 F.2d 217, 225 (7th Cir.1986), *cert. denied*, 479 U.S. 1019, 107 S.Ct. 673, 93 L.Ed.2d 724 (1986) (citing *Bounds v. Smith*,

430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977)), a prisoner's Sixth Amendment right of access to the courts does not include individual ownership of legal manuals. In order to assert Sixth Amendment protection for retaining his legal books, plaintiff Lowery would need to show either actual prejudice or a direct and continual limitation on access to legal materials in the prison, something he has not attempted here. *See Hossman v. Spradlin,* 812 F.2d 1019, 1022 (7th Cir.1987) (prisoner only temporarily or occasionally prevented from having any form of meaningful access to the courts must show prejudice in order to state a constitutional claim of denial of access to the courts); *DeMallory v. Cullen,* 855 F.2d 442, 448–49 (7th Cir.1988) (plaintiff alleging direct and continuous limitation on access to legal materials does not need to assert instances of specific prejudice). Plaintiff Lowery may very well have access to similar legal self-help manuals in the prison's library.

Plaintiffs had the option of donating the books to the prison chapel and could have maintained access to them in that way. Even if plaintiffs had been transferred to another institution, they could have continued to check out the books through the interlibrary loan system. By donating books to the prison libraries, plaintiffs would have ensured their accessibility, even if they had to share them occasionally with other inmates.

The publication limitation is a far less onerous burden on plaintiffs' free exercise of religion than the jewelry restriction. The jewelry regulation operates as a complete ban on plaintiffs' ability to wear a cross or crucifix. On the other hand, the publication limitation does not act as an absolute prohibition on plaintiffs' free exercise rights but only as a partial limitation and a minor inconvenience. *See Weir v. Nix,* 890 F.Supp. 769, 789 (S.D.Iowa 1995) (finding a similar twenty-five book limitation in Iowa correctional system did not impose a substantial burden on plaintiffs' free exercise rights). Plaintiffs retain the opportunity to maintain twenty-five religious books to study and enjoy and can gain access to additional books through the prison library.

### 2. *Compelling interest—least restrictive means*

Because plaintiffs have established that the jewelry regulation imposes a substantial burden on their free exercise of religion, defendants must prove that their regulation of that conduct is the least restrictive means of achieving a compelling governmental interest. Defendants contend that even if the jewelry rule substantially burdens plaintiffs' religious exercise, the undisputed facts establish that the rule furthers legitimate and compelling purposes: the jewelry restriction is rationally related to the compelling goal of prison order, safety and discipline and the legislative history of the Religious Freedom Restoration Act indicates a congressional intent to continue a policy of judicial deference to prison officials by deeming nearly all prison regulations to fulfill compelling interests. Defendants offer the following compelling interests in support of their prison property regulations: 1) reduction of the risk and consequences of a fire; 2) alleviation of the impact of prison overcrowding; 3) reduction of the costs associated with storage, transportation and reimbursement of inmates' personal belongings; 4) increase in the safety and security of the prison by reducing the number of places available to hide contraband; 5) prohibition of the possession of property known to be used as gang insignia; and 6) reduction of inmate possession of valuable property that is often used for barter and can lead to strong arming. Only these last two interests apply to the jewelry restriction. Plaintiffs contest each of these interests in turn and argue that the Religious Freedom Restoration Act was not intended to be a rubber stamp for prison official decisions.

The Religious Freedom Restoration Act states that one of its express purposes is to:

> restore the compelling interest test as set forth in *Sherbert v. Verner,* 374 U.S. 398 [83 S.Ct. 1790, 10 L.Ed.2d 965] (1963) and *Wisconsin v. Yoder,* 406 U.S. 205 [92 S.Ct. 1526, 32 L.Ed.2d 15] (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened.

42 U.S.C. § 2000bb(b)(1). In *Sherbert,* 374 U.S. at 402, 83 S.Ct. at 1792–93, the Supreme Court held that a law disqualifying a Seventh Day Adventist from receiving unemployment compensation benefits because she was unable to work on Saturdays for religious reasons violated the free exercise clause of the First. Amendment. In *Yoder,* the Court found unconstitutional a Wisconsin law compelling formal education until age sixteen as it applied to Amish children. 406 U.S. at 234, 92 S.Ct. at 1542–43. Congress plugged the compelling interest standard articulated in these cases into the act almost verbatim. *See* Michael Stokes Paulsen, *A RFRA Runs Through It: Religious Freedom and the U.S.Code,* 56 Mont.L.Rev. 249, 250 n. 4 (1995).

Congress found the return to the compelling interest test of *Sherbert* and *Yoder* especially necessary in the prison context. In *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987), the Supreme Court had jettisoned strict scrutiny for prisoner free exercise claims, ruling that prison regulations impinging on prisoner's constitutional rights are valid if they are reasonably related to legitimate penological interests. *Id.* at 349–50, 107 S.Ct. at 2404–05 (applying test announced a week earlier in *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)). Applying this test in *O'Lone,* the Court upheld a prison regulation effectively prohibiting several Muslims from attending religious services because the regulation was reasonably related to prison interests. *Id.* at 351–52, 107 S.Ct. at 2405–06. The Senate report accompanying the Religious Freedom Restoration Act explains that Congress rejected the standard applied in *O'Lone* and intended to "restore the traditional protection afforded to prisoners to observe their religions" that existed before *O'Lone.* S.Rep. 111, *reprinted in* 1993 U.S.C.C.A.N. at 1899.

A rejection of the *O'Lone* test does not necessarily mean that the compelling interest test has the same meaning in prisons as it does in other contexts. *See* Lupu, 56 Mont. L.Rev. at 191. In the years between the decisions in *Yoder* and *O'Lone,* the Court acknowledged the interests of states in maintaining internal order and security in their penological institutions. *See, e.g., Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Jones v. North Carolina Prisoners' Union, Inc.,* 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977); *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). The Senate report recognizes the Court's tradition of "due deference to the experience and expertise of prison and jail administrators" and explains that the committee did not intend the act "to impose a standard that would exacerbate the difficult and complex challenges of operating the Nation's prisons in a safe and secure manner." S.Rep. 111, *reprinted in* 1993 U.S.C.C.A.N. at 1899–1900. However, the committee report continues with the following statement:

> At the same time, however, inadequately formulated prison regulations and policies grounded on mere speculation, exaggerated fears, or post-hoc rationalizations will not suffice to meet the act's requirements.

*Id.* at 1900. Thus, although the plain language of the Religious Freedom Restoration Act does not declare that the compelling interest test applies any differently in the prison setting than in other arenas and contains no directions to analyze prisoner cases under less rigorous standards, the legislative history indicates that setting is important. *Id.* at 1898. ("This single test, however, should be interpreted with regard to the relevant circumstances in each case"). Other legislative history supports this conclusion. *See* Cooper, 56 Mont.L.Rev. 325 (compiling legislative history relevant to prisoner claims under the act). However, an exhaustive summary is not needed to determine that although Congress did not include any specific language in the act, it intended the interests and goals proffered by prison officials to be given high regard unless they appeared patently off base.

■ A compelling interest is one "of the highest order." *Church of the Lukumi Babalu Aye v. City of Hialeah,* 508 U.S. 520, ——, 113 S.Ct. 2217, 2233, 124 L.Ed.2d 472 (1993). The undisputed facts show that defendants imposed the property regulations in order to achieve prison order, safety and

discipline. Courts have found these goals compelling. *United States v. Slaughter,* 900 F.2d 1119, 1126 (7th Cir.1990) (compelling state interest in law enforcement and public safety); *Chambers v. Ingram,* 858 F.2d 351, 360 (7th Cir.1988) (compelling state interest in protecting the safety of others); *Azeez v. Fairman,* 604 F.Supp. 357, 363 (C.D.Ill.1985), *rev'd on other grounds,* 795 F.2d 1296 (7th Cir.1986) (prison security, discipline and administration are compelling state interests by definition). Plaintiffs raise interesting arguments that the more immediate goals of improving fire safety, easing overcrowding, reducing storage costs, reducing places to hide contraband, prohibiting possession of gang insignia property, and decreasing the amount of valuable property that leads to prisoner strong arming are not rationally related to the prison's overall order, safety and discipline goals because of their facial underinclusiveness, but defendants have offered ample evidence of the reasons behind the regulations and plaintiffs have not provided enough evidence to raise a genuine dispute as to the compelling nature of these stated goals.

Nonetheless, defendants have failed to show that the complete prohibition on jewelry is the least restrictive means of achieving their compelling goals. Defendants argue that they gave the property regulations careful and exhaustive consideration and support this claim with considerable evidence of prison official involvement in resolving the problem of excess property and gangs in the prisons. It is undisputed that defendants spent substantial time considering the property regulations. The inmate property work group examined property problems in detail over the course of several years, eventually recommending the jewelry and publication restrictions implemented by the Department of Corrections. However, plaintiffs cannot carry their burden of showing that their chosen methods of addressing the property problems are the least restrictive possible means to achieve their goals merely by pointing to the amount of time and energy spent in contemplation of the regulations. Other courts have found regulations invalid under the Religious Freedom Act when prison officials have not implemented the least restrictive means to realize compelling interests in

prison safety. *See, e.g., Alameen,* 892 F.Supp. at 450 (complete prohibition on display of black religious beads not least restrictive means of furthering compelling interest in preventing gang violence); *Campos,* 854 F.Supp. at 208 (complete prohibition on Santeria beads arguably not least restrictive means when inmate is willing to wear beads under his clothing); *Lawson v. Dugger,* 844 F.Supp. 1538, 1545 (S.D.Fla.1994) (outright ban on Hebrew Israelite literature is greater than necessary restriction on inmate's free exercise of religion).

Plaintiffs argue that other institutions dealing with analogous problems have achieved similar goals with less restrictive alternatives. For example, with respect to religious jewelry, the United States Bureau of Prisons allows inmates to wear or use personal religious items during devotional services and within the institution if the warden grants permission. 28 C.F.R. § 548.12(f). Another court has suggested that the less restrictive alternative of wearing religious jewelry under one's clothing takes away the symbol's potential of showing gang allegiance while at the same time preserving a matter of personal religious significance. *See Campos,* 854 F.Supp. at 208. Plaintiffs suggest a number of other alternatives that would fulfill their religious aspirations and allow prison officials to achieve their goals at the same time.

In analyzing these proffered alternatives, I am mindful of the need for courts to treat the decisions of prison officials with deference and respect. *See Johnson v. Phelan,* 69 F.3d 144, 145–46 (7th Cir.1995) (animating theme of Supreme Court's prison jurisprudence for last twenty years is that judges should respect hard choices made by prison administrators). But deference and respect do not mean that courts should refrain from becoming involved when inmates' important constitutional interests are being impinged.

Defendants' legitimate concern for prohibiting the wearing of valuable jewelry can be met by imposing a limit on the value of such jewelry or by providing inexpensive versions to inmates for purchase. In addition, defendants' concerns about gang identification can

be addressed by requiring that religious jewelry be worn under clothing and removed for showering. I offer these suggestions as no more than that. It is up to defendants to determine exactly what steps they will take to comply with this decision.

Having determined that the Religious Freedom Restoration Act does not offer plaintiffs their desired relief on the twenty-five publication limit, I turn to plaintiffs' remaining claims to determine whether they warrant a grant of relief.

### B. First Amendment

 Plaintiffs are correct in noting that prisoners do not leave their First Amendment rights at the prison gates, *Al-Alamin v. Gramley*, 926 F.2d 680, 686 (7th Cir.1991); *Caldwell*, 790 F.2d at 596, but following the Supreme Court's decisions in ·*Turner*, 482 U.S. 78, 107 S.Ct. 2254, and *O'Lone*, 482 U.S. 342, 107 S.Ct. 2400, prisoner free exercise claims are analyzed on a rational basis standard. According to *O'Lone*, a "regulation must have a logical connection to legitimate governmental interests invoked to justify it." 482 U.S. at 350, 107 S.Ct. at 2405. This rational basis standard is far more deferential to prison officials than the test established by the Religious Freedom Restoration Act. *See Williams v. Lane*, 851 F.2d 867, 877 (7th Cir.1988) (setting forth four-part summary of *Turner–O'Lone* test). Because plaintiffs have failed under the more liberal standard of the act, they cannot succeed on their First Amendment claim. Even if I had determined that defendants' stated goals were not compelling, their property regulations are rationally related to legitimate governmental interests.

### C. Fourteenth Amendment

 Plaintiffs contend that they have liberty interests in the possession of crucifixes and religious books above the twenty-five publication limit and that defendants have deprived them of due process in denying them these items. Plaintiffs' due process claim is essentially just another ground on which they attempt to stand in making arguments that were addressed in the discussion of their Religious Freedom Restoration Act and First Amendment claims. It is extremely unlikely that defendants could establish liberty interests in these items after the Supreme Court's recent decision in *Sandin v. Conner*, —— U.S. ——, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). Even if they could, the Fourteenth Amendment is not the proper basis for plaintiffs' free exercise claims. *See Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989) (explicit textual source of constitutional protection, not Fourteenth Amendment, should be guide for analyzing claim).

### D. Overbreadth

 Plaintiffs argue that I should invalidate defendants' property regulations because they are overbroad.[3] The overbreadth doctrine allows a person who has engaged in conduct not protected by the Constitution to challenge his prosecution because the law under which he is being prosecuted might be used against other individuals whose conduct is protected by the Constitution. *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 503, 105 S.Ct. 2794, 2801–02, 86 L.Ed.2d 394 (1985). Courts generally should not entertain overbreadth challenges when the parties challenging the facial validity of the statute are those who seek to engage in the activity that the overbroad law purports to punish. *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984).

This is not the type of case in which an overbreadth challenge is necessary. Plaintiffs are sufficiently representative of the individuals affected by the property regulations, making it unnecessary to engage in the speculative inquiry of the constitutional rights of other individuals that could be violated by the regulations. Plaintiffs do not suggest that the regulations are constitutional with respect to their religious conduct but

---

**3.** Plaintiffs further contend that the court should find the property regulations void for vagueness but do not actively pursue this argument. Defendants' policies give inmates sufficient notice of the scope of prohibited conduct; indeed, plaintiffs characterize them as "abundantly clear and rigid." Therefore, plaintiffs' vagueness argument must fail.

are unconstitutional with respect to the religious practices of other inmates. Rather plaintiffs seek the contrary, a ruling that the regulations are unconstitutional as applied to their own conduct. I have discussed plaintiffs' claims in adequate detail already and simply note that the overbreadth doctrine does not change the decision on those claims.

### ORDER

IT IS ORDERED that defendants' motion for summary judgment is GRANTED and plaintiffs' motion for summary judgment is DENIED with respect to Internal Management Procedure DOC 309 IMP # 4, the twenty-five publication limitation. Plaintiffs' motion for summary judgment is GRANTED and defendants' motion for summary judgment is denied with respect to Internal Management Procedure DOC 309 IMP # 1–D, the jewelry restriction.

IT IS FURTHER ORDERED AND ADJUDGED that:

1. Defendants' internal management procedure prohibiting the wearing of religious jewelry is declared to have violated, and to continue to violate, plaintiffs' rights under the Religious Freedom Restoration Act;

2. Defendants are enjoined from enforcing Internal Management Procedure DOC 309 IMP # 1–D (jewelry prohibition) with respect to plaintiffs and any other persons who can demonstrate a sincere religious motivation for wearing such jewelry;

The clerk of court is directed to enter judgment in accordance with this order and to close this case, subject to its reopening, if necessary, to enforce the terms of this order and to grant further relief.